**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | Civil Action No. 7:23-cv-08178-CS |
| ZABEN, LLC, and WEINSTOCK PARTNERS LLC, on behalf of themselves and all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK and JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.) ) | |
| ) | |
| Defendants. ) | |
| ) | |

**<u>PLAINTIFF WEINSTOCK PARTNERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS JHUSA'S FIRST AMENDED COUNTERCLAIM</u>**

## <u>TABLE OF CONTENTS</u>

I.   Factual Background ........................................................................................ 5

    A.   Term Policy Conversion Rights ................................................................ 5

    B.   Mr. Weinstock Procures the Policy on His Own Life ............................. 6

    C.   Mr. Weinstock Sells the Policy to Weinstock Partners and Keeps
        $250,000 of the Death Benefit ................................................................. 7

    D.   Weinstock Partners Exercises Its Contractual Right to Convert the
        Policy ........................................................................................................ 8

    E.   Hancock Retaliates and Challenges the Policy more than 17 Years
        after Issuance and more than 9 Years after Conversion. ........................ 9

II.  Legal Standard .............................................................................................. 10

III. Argument ...................................................................................................... 10

    A.   JHUSA's Counterclaim Seeks to Rewrite Its Contract........................... 11

    B.   JHUSA's Counterclaim Fails under Governing New York Law.......................... 12

    C.   New York Law Controls, But JHUSA Loses in New Jersey Too ...................... 19

IV.  Conclusion ................................................................................................... 24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*131 Heartland Blvd. Corp. v. C.J. Jon Corp.*,
   921 N.Y.S.2d 94 (2d Dep't 2011) ............................................................................................. 11

*Aetna Life Ins. Co. v. Dunken*,
   266 U.S. 389 (1924) .................................................................................................... *passim*

*Ameritas Life Ins. Co. v. Wilmington Tr., N.A.*,
   2024 WL 4402028 (C.D. Cal. Oct. 3, 2024), *appeal filed*, No. 24-6801 (9th
   Cir. 2024) ................................................................................................... 1, 16, 18, 19

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................. 10

*Baker v. Washington Nat'l Ins. Co.*,
   823 F.2d 156 (5th Cir. 1987) ..................................................................................... 15

*Burr v. Equitable Life Ins. Co. of Iowa*,
   84 F.2d 781 (9th Cir. 1936) .................................................................................... 1, 15

*Commonwealth Life Ins. Co. v. Jackson*,
   432 N.E.2d 1382 (Ind. Ct. App. 1982) ....................................................................... 15

*Dunn Auto Parts, Inc. v. Wells*,
   198 A.D.3d 1269 (4th Dep't 2021) ............................................................................ 16

*Faulkner v. Nat'l Geographic Soc'y*,
   452 F. Supp. 2d 369 (S.D.N.Y. 2006), *aff'd sub nom. Ward v. Nat'l
   Geographic Soc'y*, 284 Fed. App'x. 822 (2d Cir. 2008) ........................................... 4, 19

*Gans v. Aetna Life Ins. Co.*,
   214 N.Y. 326 (1915) .................................................................................................. 17

*Goldwater v. Jackson Nat'l Life Ins. Co.*,
   555 F. Supp. 1022 (N.D. Cal. 1983) ......................................................................... 1, 15

*Grigsby v. Russell*,
   222 U.S. 149 (1911) ................................................................................................... 15

*Henry v Agostini*,
   12 Misc. 15 (NY Com. Pl. 1895) ................................................................................ 19

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank*,
   747 F.3d 44 (2d Cir. 2014) ........................................................................................ 14

*Jarmon v. Am. Heritage Life Ins. Co.*,
    267 A.2d 601 (Del. Super. Ct. 1970) ...........................................................17

*Mass. Mut. Life Ins. Co. v. Thacher*,
    222 N.Y.S.2d 339 (1st Dep't 1961), *aff'd*, 183 N.E.2d 79 (N.Y. 1962)..................11

*Metro. Life Ins. Co. v. Woolf*,
    47 A.2d 340 (N.J. App. Ct. 1946)...............................................................22

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Cos.*,
    265 F.3d 97 (2d Cir. 2001)......................................................................24

*New England Mut. Life Ins. Co. v Caruso*,
    73 N.Y.2d 74 (1989) ..........................................................................14, 19

*Occidental Life Ins. Co. v. Hurley*,
    513 S.W.2d 897 (Tex. Civ. App. 1974) .....................................................15, 18

*Othon v Wesleyan Univ.*,
    612 F. Supp. 3d 35 (D. Conn. 2020).............................................................10

*Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*,
    2012 WL 967301 (S.D.N.Y. Mar. 20, 2012) ................................................3, 20

*Phila. Life Ins. Co. v. Erwin*,
    182 S.E. 209 (Va. 1935)...........................................................................1, 15

*Silliman v. Int'l Life Ins. Co.*,
    174 S.W. 1131 (Tenn. 1915)..........................................................................1

*Sperling v. Great Am. Indem. Co.*,
    166 N.E.2d 482 (1960)..................................................................................11

*Sun Life Assurance Co. v. Wells Fargo Bank N.A.*,
    208 A.3d 839 (N.J. 2019)................................................................... *passim*

*Valley Nat'l Bank v Greenwich Ins. Co.*,
    254 F. Supp 2d 448(S.D.N.Y. Apr. 1, 2003) .................................................20

*Warnock v. Davis*,
    104 U.S. 775 (1882)....................................................................................15

**Statutes**

N.J. Stat. Ann. § 17B:24-1.1 ....................................................................4, 21, 23

N.J. Stat. Ann. § 17B:30B-1-20 ....................................................................4, 22

N.J. Stat. Ann. § 17B:30B-10(a)(1) ..................................................................23

N.J. Stat. Ann. § 17B:30B-18 ..................................................................................21

N.Y. Insurance Law ISC § 3205 ..............................................................................13

**Other Authorities**

Couch on Insurance, § 34:17, 3d ed. .......................................................................22

Dep't of Ins. Ltr. (NYDFS Ltr.), 2011 WL 13593329 (Feb. 25, 2011) ...................3, 14

Kyle Proebsting and Lindsay Meisinger, *Term Conversion Survey Results* ...................6

2 *Law of Life and Health Insurance* § 5.20T (2025) ....................................5, 15, 16, 21

Plaintiff Weinstock Partners LLC ("Weinstock Partners") moves to dismiss John Hancock Life Insurance Company (U.S.A.)'s declaratory judgment counterclaim.[1]

In response to Weinstock Partners filing this class action lawsuit challenging Hancock's cost of insurance overcharges, Hancock retaliated by challenging the "conversion" made in 2016 of Plaintiff's policy from term life to universal life. In doing so, Hancock asserts a legal theory that courts across the country have rejected, including the United States Supreme Court, numerous other state and federal courts—including one just eight months ago on a motion to dismiss, and insurance regulators. Indeed, the New York Department of Financial Services (NYDFS) already rejected the very legal theory asserted here in a 2011 letter to JHNY.

Those authorities have all held that a conversion policy is merely a continuation of the term policy that granted the conversion right, at least where, as here, the death benefit is not being increased. *See Aetna Life Ins. Co. v. Dunken*, 266 U.S. 389, 399 (1924) (holding that a second policy is a "continuation" of the first where—as here—the "second policy [is] issued in pursuance of, and [is] dependent for its existence and its terms upon, the express provisions of the contract contained in the first one"); *see also Burr v. Equitable Life Ins. Co. of Iowa*, 84 F.2d 781, 782 (9th Cir. 1936); *Goldwater v. Jackson Nat'l Life Ins. Co.*, 555 F. Supp. 1022, 1024-25 (N.D. Cal. 1983); *Phila. Life Ins. Co. v. Erwin*, 182 S.E. 209, 211 (Va. 1935); *Silliman v. Int'l Life Ins. Co.*, 174 S.W. 1131, 1132 (Tenn. 1915). As a result, "an insurable interest is not required at the time of conversion," but only at the time the term policy originally takes effect. *Ameritas Life Ins. Co. v.*

---

[1] This memorandum refers to John Hancock Life Insurance Company (U.S.A.) as "Hancock" or "JHUSA," John Hancock Life Insurance Company New York as "JHNY," and the affiliates together as "Hancock Defendants." Weinstock Partners refers to the First Amended Complaint (ECF No. 33) as "Compl.," Defendants' Amended Answer and Hancock's First Amended Counterclaim (ECF No. 104) as "Counterclaim," Exhibit A to the Counterclaim (the term policy) as the "Policy," and Exhibit E to the Counterclaim (the universal policy) as the "Converted Policy." All emphasis to quotations cited in this brief are added, unless otherwise noted.

*Wilmington Tr., N.A.,* 2024 WL 4402028, at *4 (C.D. Cal. Oct. 3, 2024) (granting motion to dismiss against carrier alleging an insurable interest challenge to the exercise of a conversion privilege in a term life policy), *appeal filed*, No. 24-6801 (9th Cir. 2024).

The Court should follow those authorities and dismiss the counterclaim as well.

Hancock is seeking to re-write the express terms of the term Policy (the "Policy") in violation of bedrock contract law. There is no dispute that Mr. Weinstock had an insurable interest in the Policy that insured his own life when it was issued to him. The Policy explicitly permits the owner to sell it, which he did in in 2015 to Weinstock Partners, and Mr. Weinstock's family remained entitled to collect $250,000 of the $2.5 million death benefit even after he sold it to Weinstock Partners. Counterclaim ¶¶ 18, 28, 31. Per Section 11 of the Policy, "the owner can change the ownership of the policy by written request," and the owner can "exercise all rights and privileges granted by the policy." Policy at -192. One of the owner's rights was the Policy's conversion right, which allowed the owner "to convert this policy to any permanent plan of insurance offered for sale by the Company or one of its affiliated companies." *Id.* The Policy makes clear: "***We will not require evidence of insurability at the time of conversion***, up to the face amount of this policy." *Id.* In 2016, Weinstock Partners exercised its conversion right under Section 10 of the Policy, converting it to a universal life policy with the same face amount ($2.5 million). Counterclaim ¶¶ 33, 37; Converted Policy at -8147. The Converted Policy included an endorsement, signed by JHUSA's President, providing that "***This policy is issued in accordance with the Conversion privilege***" under the Policy. Converted Policy at -8181.

Accordingly, it is New York law that governs the conversion. *See Dunken*, 266 U.S. at 399-400 (holding that a converted policy is governed by the law that governed when originally issued). And even Hancock appears to concede, as it must, that its counterclaim fails as a matter of law

once New York law applies, both because the two-year contestability period has expired, and because the NYDFS has already told Hancock that what it is attempting to do here is unlawful. As NYDFS stated in 2011:

> STOLI only arises at the time the policy is originally procured. For the reasons stated above, the issuance of the converted policy here, where the face amount of the policy is the same as the policy being converted, is not the issuance of a "new policy" but rather an extension of the existing policy, albeit in a different form and with different terms. No new insurance is being purchased.

Dep't of Ins. Ltr. ("NYDFS Ltr."), 2011 WL 13593329, at *7 (Feb. 25, 2011).

Hancock tries to get around these fatal defects to its counterclaim by pointing to the New Jersey choice of law clause in the Converted Policy, the fact that the Converted Policy is insured by JHUSA rather than its affiliate JHNY, and—via its recent amendment to the counterclaims—statements in Weinstock Partners' internal emails referring to it as a "new policy." These tactics fail.

First, which state's law governs the *interpretation* of policy is a different question than which state's law governs its *validity*. *Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A.*, 2012 WL 967301, at *5 (S.D.N.Y. Mar. 20, 2012). What is at issue in the counterclaim is the validity of the conversion itself. That conversion is governed by New York law because the Converted Policy was "issued in accordance with the Conversion privilege" set forth in a contract that Hancock admits is governed by New York law. Converted Policy at -8181. Further, because Hancock expressly agreed that "The time periods of the Suicide and Incontestability periods of the new policy will be deemed to have been met to the extent coverage was in force under this [term] policy," Policy at -192, it is New York's—not New Jersey's—rules on contestability that matter. Under Hancock's claim, what was an incontestable policy suddenly became newly contestable upon conversion, which is the exact opposite of what the Policy says and the law provides.

Second, that the Converted Policy was issued by JHUSA (John Hancock's non-New York

entity) is irrelevant because that too was expressly contemplated in the Policy. *See* Policy at -192 (permitting owner "to convert this policy to any permanent plan of insurance offered for sale by the Company *or one of its affiliated companies*"). That a New York owner moves to a different state in which the original insurer is not licensed, or exercises its contractual right to choose a product issued only by an affiliate, is not grounds for invalidating a secondary owner's conversion rights.

Third, that the Converted Policy was informally referred to as a "new policy" or a "new contract" in the secondary owner's private emails cannot possibly change any of the foregoing legal principles. Hancock cites those emails as evidence of an intent that the Converted Policy be a "new" policy that overrides *Dunken*'s general rule about "continuation." Counterclaim ¶ 50. In *Dunken*, the Supreme Court likewise referred to the conversion policy as a "new policy," 266 U.S. at 396, 399-400, and still held that it was governed by the law of the state in which the term life policy was issued, *id.* at 399. And a party's subjective intent is not even relevant to the threshold question that *Dunken* decided about whether the four corners of the contract mean that the Converted Policy is a "continuation" of the term Policy. *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006), *aff'd sub nom. Ward v. Nat'l Geographic Soc'y*, 284 Fed. App'x. 822 (2d Cir. 2008).

In any event, even if New Jersey law did apply, the result would be the same. Like New York, New Jersey recognizes that "[v]alid life insurance policies are assets that can be sold." *Sun Life Assurance Co. v. Wells Fargo Bank N.A.*, 208 A.3d 839, 856 (N.J. 2019) (citing *Grigsby v. Russell*, 222 U.S. 149, 156 (1911)). New Jersey requires an insurable interest only at the time the contract was made, N.J. Stat. Ann. §17B:24-1.1, and permits the free and full transfer of contractual rights in the secondary market, *see id.* §§ 17B:30B-1-20. Here, the contract was made

when the Policy was issued, *see* Converted Policy at -8181 ("This policy is issued in accordance with the Conversion privilege."), and no new insurable interest was required to exist because the amount of life insurance never changed. Tellingly, Hancock has been unable to cite a single New Jersey law or case requiring an insurable interest at the time of conversion (*see* Hancock's Pre-Mot. Ltr., ECF No. 100), and Hancock's counterclaim flies in the face of the contractual promises that (a) evidence of insurability is not required at time of conversion and (b) the then-current owner can exercise "all rights and privileges granted by the [P]olicy." Policy at -190, 192. So even if New Jersey law applies (it doesn't), the Court should still grant the motion to dismiss.

## I.    Factual Background

### A.    Term Policy Conversion Rights

Term life insurance policies require fixed monthly premium payments over a set period, such as ten or twenty years. Compl. ¶ 19. If the policyowner pays premiums and the insured dies during the term, the insurance company pays the death benefit. If the insured survives past the term, the policy terminates without payment of the death benefit. Universal life ("UL") insurance covers the insured's life: so long as the policyowner pays sufficient premiums to keep the policy in force, the insurance company must pay the death benefit upon the insured's death. UL policies combine the death benefit with a savings or investment component, often known as the "account value" or "policy value." *Id.* UL policies permit flexibility in the amount and timing of premiums necessary to keep the policies in force. *Id.*

Many term policies offer a conversion right, which allows the owner to convert the term policy into a permanent policy. *See* 2 *Law of Life and Health Insurance* § 5.20T (2025). The conversion right is valuable: it allows the converting policyowner to have an automatic right to convert the policy into a UL policy with the same risk class and face amount as the original term policy, and which provides coverage through the life of the insured, even if the insured is sick at

the time of conversion. Insurance companies typically "build the cost of conversion into the term policy either implicitly or explicitly." Kyle Proebsting and Lindsay Meisinger, *Term Conversion Survey Results*, Reinsurance News, Society of Actuaries, Issue 81, Sept. 2015, at 29.

**B.    Mr. Weinstock Procures the Policy on His Own Life**

In February 2008, Israel Weinstock applied to JHNY for a term life insurance policy insuring his own life. Counterclaim ¶ 16. Mr. Weinstock was 67 years old and lived in Brooklyn, New York when he applied for the Policy. *Id.* ¶ 17. Mr. Weinstock named his wife, Freida Weinstock, as the primary beneficiary and his children the secondary beneficiaries of the Policy. *Id.* JHNY issued the term life insurance Policy to Mr. Weinstock on June 19, 2008 with a face amount of $2.5 million. *Id.* ¶ 18. It is undisputed that the Policy was issued in New York, and that New York law governs the Policy. *Id.* And it is undisputed that Mr. Weinstock had an insurable interest in his policy that insured his own life when it was issued to him.

Nothing in the Policy prohibits the policyowner from selling the Policy. To the contrary, the Policy expressly permits the owner to sell it. Per Section 11, "the owner can change the ownership of the policy by written request," and the owner can "exercise all rights and privileges granted by the policy." *Id.* at -192; *see also id.* at 190 (defining "you" as "the Owner of this policy.").



## 11. OWNER AND BENEFICIARY

Until the Life Insured's death, without the consent of any revocable beneficiaries, you can receive any amount payable under the policy and exercise all rights and privileges granted by the policy.

**Change of Owner.** Until the Life Insured's death, the owner can change the ownership of the policy by written request. The change will take effect as of the date you signed the written request. It will not apply to any payments we made or any action we may have taken before we received your written request.

One of those rights was the conversion right: an option to convert from term to permanent life insurance by "the earlier of the 10th policy anniversary or the policy anniversary nearest the

life insured's attainment of age 75." Policy at -187. Because Mr. Weinstock turned 75 in October 2015, the Policy entitled the owner to convert until April 28, 2016. Counterclaim ¶ 19. Per the "Conversion" provision, the policyowner "can by written request elect to convert this policy to any permanent plan of insurance offered for sale by the Company or one of its affiliated companies." Policy at -192. The Policy makes clear: "***We will not require evidence of insurability at the time of conversion***, up to the face amount of this policy." *Id.* Nor would Hancock require additional underwriting, since "risk classification for the permanent insurance will be the same as this policy." *Id.*

---

**10. CONVERSION**

During the Conversion Period stated on page 3, you can by written request elect to convert this policy to any permanent plan of insurance offered for sale by the Company or one of its affiliated companies.

The Life Insured must meet the requirements for age, risk classification, minimum face amount, and minimum premium for the policy you select.

We will not require evidence of insurability at the time of conversion, up to the face amount of this policy. The risk classification for the permanent insurance will be the same as this policy, or if not available then the most comparable risk classification available.

---

The Policy also provides that, in the event of conversion, "The time periods of the Suicide and Incontestability periods of the new policy will be deemed to have been met to the extent coverage was in force under this policy." *Id.*

---

**Suicide and Incontestability.** The time periods of the Suicide and Incontestability periods of the new policy will be deemed to have been met to the extent coverage was in force under this policy. We can contest an increase in the face amount, or any policy change, or the addition of a supplementary benefit for two years after the date of an increase or addition.

---

### C.   Mr. Weinstock Sells the Policy to Weinstock Partners and Keeps $250,000 of the Death Benefit

On February 8, 2015, Mr. Weinstock entered into a Life Settlement Agreement with Weinstock Partners LLC in which he exchanged ownership of the Policy for $40,000. Counterclaim ¶ 28. The sale advantaged the Weinstock family in multiple ways. In addition to providing immediate liquidity, the sale agreement entitled Mrs. Weinstock to a 10% irrevocable

beneficiary interest. *Id.* ¶¶ 28, 31. In other words, the Weinstock family remained entitled to collect $250,000 of the $2.5 million death benefit even after the sale to Weinstock Partners.

Weinstock Partners notified Hancock of the ownership change on February 10, 2015, including the fact that Mrs. Weinstock remained a beneficiary. *Id.* ¶¶ 30-31. Hancock notified Weinstock Partners on February 24, 2015 that it had accepted the ownership change and designated Weinstock Partners as the new owner of record. *Id.* ¶ 32.

### D.    Weinstock Partners Exercises Its Contractual Right to Convert the Policy

On April 18, 2016, Weinstock Partners exercised its right under Policy Section 10 to convert the Policy from a term policy to a UL permanent policy. Counterclaim ¶ 33. the Policy provided, "The risk classification for the permanent insurance will be the same as this policy." Policy at -192. Weinstock Partners selected the UL insurance policy under the plan name, "Protection UL."

Less than a month later, Hancock processed the application and converted the policy on May 10, 2016, with a policy date of April 28, 2016. *Id.* ¶ 37. The Converted Policy had the exact same face amount as the Policy ($2.5 million) and insured the same risk (Mr. Weinstock's life). *Id.* ¶¶ 18, 37. The Policy included an endorsement, signed by Hancock's President, providing that "This policy is issued ***in accordance with the Conversion privilege on Policy No. 81729576*** [the Term Policy]." Converted Policy at -8181.

**ENDORSEMENT** – Policy 93 159 493

**ISSUED UPON EXERCISE OF CONVERSION PRIVILEGE**

This policy is issued in accordance with the Conversion privilege on Policy No. 81729576 dated at this 10th of May 2016.

_President_

According to the Converted Policy application, "its Suicide and Incontestability periods will be deemed to have been met to the same extent that they were met under the term policy." *Id.* at - 8185.

The parties to the Policy had expressly contemplated the possibility that one of JHNY's affiliates (e.g., Hancock) would issue the Converted Policy. The Policy provides that the policy owner "can by written request elect to convert this policy to any permanent plan of insurance offered for sale by the Company *or one of its affiliated companies.*" Policy at -192. Mr. Weinstock's address at the time of the conversion in 2016 had changed from Brooklyn, New York to Lakewood, New Jersey. Counterclaim ¶ 17; Converted Policy at -8183. While the Policy was issued by JHNY, its affiliate JHUSA issued the Converted Policy. The Converted Policy states that it "will be governed by and construed according to the laws of New Jersey." Converted Policy at -8180.

### E.    Hancock Retaliates and Challenges the Policy more than 17 Years after Issuance and more than 9 Years after Conversion

On September 15, 2023, Weinstock Partners and another Plaintiff, Zaben LLC, filed this putative class action seeking damages for Hancock's cost of insurance overcharges. More than

eighteen months later, JHUSA filed a counterclaim against Weinstock Partners, seeking a declaratory judgment that the Policy is unlawful STOLI under New Jersey law. Counterclaim ¶ 63. *Seventeen years* after promising that the Policy owner had the right to convert and that it would "not require evidence of insurability at the time of conversion," Policy at -192, and *nine years* after fulfilling that promise in issuing the Converted Policy, Hancock is now trying to cancel the Policy on grounds that there was not sufficient evidence of insurability at the time of conversion.

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).  A motion to dismiss is the "appropriate vehicle" for determining the "legal feasibility" of a claim. *Othon v Wesleyan Univ.*, 612 F. Supp. 3d 35, 37 (D. Conn. 2020). And the Court should grant a motion to dismiss where "there is no set of facts on which [JHUSA] would be entitled to relief as against" Plaintiff. *Iqbal*, 556 U.S. at 669 (cleaned up).

## III.    Argument

Just as courts and regulators have done, time after time, starting in *Dunken* in 1924, against JHNY itself in 2011, and as recently as a few months ago in *Ameritas Life Insurance Company* on a motion to dismiss, this Court should reject another life insurance company's improper attempt to require evidence of insurability at conversion when a term policy provides a conversion right.

JHUSA's counterclaim, in fact, squarely contradicts its contractual promise that any owner (including a secondary owner) could exercise the Policy's conversion right and that Hancock would not require evidence of insurability at conversion. The Policy's clear terms are supported by century-old precedent holding that a converted policy is a continuation of the policy—not a new policy. Thus under New York law (which applies here) and New Jersey law (which JHUSA

wrongly argues applies here), the Policy is valid: the Converted Policy is a continuation of the Policy as a matter of law. Because the Policy satisfied the insurable interest requirement, so does the Converted Policy.

A.    **JHUSA's Counterclaim Seeks to Rewrite Its Contract**

JHUSA's counterclaim requires impermissibly re-writing the Policy's terms. The Policy gave the owner the right to "change the ownership of the policy," Policy at -192, which Mr. Weinstock did in 2015. Roughly seven years after Hancock issued the Policy, Mr. Weinstock sold it to Weinstock Partners. Counterclaim ¶ 28. Under the Policy, the owner could "exercise all rights and privileges granted by the policy." Policy at -192. One such privilege was the right "to convert this policy to any permanent plan of insurance offered for sale by the Company or one of its affiliated companies." *Id.* Weinstock Partners exercised that privilege in 2016.

JHUSA now claims that conversion rights cannot be exercised by secondary owners. But it is hornbook law that a court "may not rewrite the contract or impose additional terms which the parties failed to insert." *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 921 N.Y.S.2d 94, 97 (2d Dep't 2011). That doctrine applies with full force in insurance cases, where "the court is not at liberty to inject a clause into the policy or *to make a new contract for the protection of the insurance company*." *Sperling v. Great Am. Indem. Co.*, 166 N.E.2d 482, 485 (1960) (quoting *Taylor v. U.S. Cas. Co.*, 269 N.Y. 360, 363 (1936)). As the Appellate Division once underscored in a related context: "When the insurer waives the requirement for evidence of insurability, the applicant policyholder is entitled to believe, and reasonably so, that upon payment of the stated premium, he will receive full benefits without again facing a two-year suicide exclusion clause." *Mass. Mut. Life Ins. Co. v. Thacher*, 222 N.Y.S.2d 339, 345 (1st Dep't 1961), *aff'd*, 183 N.E.2d 79 (N.Y. 1962). The same applies here: Hancock cannot turn around, after waiving the requirement for insurability and providing an unconditional conversion right that is exercisable by any owner

of the policy, and attempt to cancel the Converted Policy on grounds of insurability. As the Court recognized at the pre-motion conference:

> I'll not make any decisions today, obviously, I'll wait for a full briefing, but it does seem like the -- it's a powerful point that the...a buyer could never exercise rights under the policy that the parties contemplated the buyer exercising if the Court would go the other way, particularly here where there's a clear statement in the policy that they're not going to require evidence of insurability, so it would be contrary to the parties' expectation for the Court to say, well, you still have to have an insurable interest.

Hr'g Tr. at 4, ECF No. 111. Nothing in JHUSA's amended counterclaim changes any of this.

### B.    JHUSA's Counterclaim Fails under Governing New York Law

JHUSA's counterclaim flouts century-old precedent that confirms a converted policy is a "continuation" of the original policy, not a "distinct" policy. The Supreme Court ruled that a second policy is a "continuation" of the first where—as here—the "second policy [is] issued in pursuance of, and [is] dependent for its existence and its terms upon, the express provisions of the contract contained in the first one." *Dunken*, 266 U.S. at 399. That is because, "upon the simple application of the insured, the new policy must issue. Nothing was left to future agreement." *Id.* "If the insurance company had refused to issue the second policy upon demand, the insured could have compelled it by a suit in equity for specific performance." *Id.* at 400.

Here, as in *Dunken*, the Converted Policy was issued "in pursuance of, and was dependent for its existence and its terms upon," the Policy. *Id.* at 399. Per JHUSA's own endorsement signed by the President of JHUSA, the Converted Policy was "issued in accordance with the Conversion privilege" on the Policy. Converted Policy at -8181. The Policy required Hancock to offer Weinstock Partners "any permanent plan of insurance offered for sale by [JHNY] or one of its affiliated companies," without having to show "evidence of insurability at the time of conversion." Policy at -192. Weinstock Partners needed simply to pick among the policies offered by Hancock

12

and its affiliates. There was, in the words of *Dunken*, "nothing [] left for future agreement." 266 U.S. at 399.

Nor did the conversion here create any new insurance risk. The risk that Hancock insured under the Converted Policy was the same—$2.5 million on Mr. Weinstock's life. Hancock accordingly did not require any additional underwriting for the conversion: the Policy provided that "[t]he risk classification for the permanent insurance will be the same as this policy." Policy at -192. This is true even if the Converted Policy were converted in a new state. *Dunken*, 266 U.S. at 400 (holding Tennessee law governed where original policy was issued in Tennessee and policy was converted in Texas).

There is no dispute that New York law governs the Policy. Counterclaim ¶ 18. Mr. Weinstock applied for life insurance in 2008 from his residence in Brooklyn, New York. Counterclaim ¶ 17; Policy at -195. The Policy was issued in New York. *Id.* ¶ 18. Nor is there any dispute that an insurable interest supports the Policy. Per New York Insurance Law ISC § 3205(b)(1), "Any person of lawful age may on his own initiative procure or effect a contract of insurance upon his own person for the benefit of any person, firm, association or corporation." That is precisely what Mr. Weinstock did: he procured the Policy on his own life. Mr. Weinstock could have named anyone as his beneficiary, but he also chose an individual—his wife—who had an insurable interest in his life. *See* ISC § 3205(a)(1) (defining an insurable interest to include "in the case of persons closely related by blood or by law, a substantial interest engendered by love and affection.").

Because the converted policy is a continuation of the Policy, Hancock had only two years from issuance of the Policy to challenge the validity for lack of insurable interest (and in any event, there is no dispute that Mr. Weinstock had an insurable interest in the Policy when it was issued).

*New England Mut. Life Ins. Co. v Caruso*, 73 N.Y.2d 74, 77 (1989) ("[P]assage of the incontestability period bars the insurer from thereafter asserting the policyholder's lack of an insurable interest."). Thus, the time to challenge any alleged lack of insurable interest expired in 2010, and JHUSA's insurability challenge is untimely (many times over). The Policy and conversion application themselves confirm this: Hancock, in the Policy, specifically confirmed, "The time periods of the Suicide and Incontestability periods of the new policy will be deemed to have been met to the extent coverage was in force under this policy." Policy at -192. Likewise in the conversion application: "On the date that the [converted] policy takes effect, its Suicide and Incontestability Periods will be deemed to have been met to the same extent that they were met under the term policy." Converted Policy at -8185. It would make no sense for Hancock to provide this contractual commitment if the policy was a new and independent contract, rather than a continuation of the prior agreement.

Hancock previously made a similar argument against another policyholder in New York. Hancock denied a policyholder's December 21, 2009 request to convert a term policy on grounds that the insured intended to sell the policy once converted to a third-party without an insurable interest. In response to a complaint letter from that policyholder, the New York Department of Insurance (the predecessor to the NYDFS) reviewed the language and history of the insurable interest statute and regulations. The Department was emphatic: "*[A] conversion, to the extent there is no increase in the death benefit, is a continuation of the policy being converted*." NYDFS Ltr., 2011 WL 13593329, at *7 (citing *Dunken*, 266 U.S. at 389).

Despite NYDFS's authoritative guidance, JHUSA tries distinguishing *Dunken* because it was decided under federal common law, pre-*Erie*. That is a distinction without a difference. Federal common law embodies "general principles of contract law." *Hillside Metro Assocs., LLC*

14

*v. JPMorgan Chase Bank*, 747 F.3d 44, 49 (2d Cir. 2014).[2] In addition to NYDFS, numerous authorities across the country have embraced *Dunken* as the "general rule": namely, that "a term insurance policy that as a matter of contract right is convertible into another form, such as whole life, is a continuation of the policy." 2 *Law of Life and Health Insurance* § 5.20T (2025) nn. 3 (collecting cases).

For instance, in Virginia, "an insurance contract issued in fulfillment of a term contract of insurance does not constitute a new contract, but is simply a continuation of the old or original contract." *Phila. Life Ins. Co.*, 165 Va. at 476. The Ninth Circuit (applying California law) and Tennessee Supreme Court both have held: "[i]t seems to us quite clear that under the facts stated the new [converted] policy was but a continuation of the same insurance contract." *Burr*, 84 F.2d at 782 (quoting *Silliman*, 174 S.W. at 1132) (where original policy granted owner right to make a selection to convert policy to new form based on old application and old medical exam). In numerous contexts, courts have found that "a subsequent contract made in pursuance of an unrestricted provision of an earlier one is to be regarded as a continuation of the status of the first." *Baker v. Washington Nat'l Ins. Co.*, 823 F.2d 156, 158 (5th Cir. 1987); *see, e.g.*, *Goldwater*, 555 F. Supp. at 1024-25 (ruling for insurer and holding that disability began after policy was in force because converted policy was continuation of original policy); *Commonwealth Life Ins. Co. v. Jackson*, 432 N.E.2d 1382, 1388 (Ind. Ct. App. 1982) ("second policy was dependent on first for its existence" where it issued pursuant to conversion privilege with "no question relating to insurability or physical examination"); *Occidental Life Ins. Co. v. Hurley*, 513 S.W.2d 897, 901

---

[2] Tellingly, JHUSA's primary authority under New Jersey law, *Sun Life*, 238 N.J. 157, relied heavily on its analysis on pre-*Erie* Supreme Court decisions articulating general common law principles—such as *Warnock v. Davis*, 104 U.S. 775 (1882) and *Grigsby v. Russell*, 22 U.S. 149 (1911)—as persuasive. *Sun Life*, 238 N.J. at 165, 169, 175.

(Tex. Civ. App. 1974) (converted policy is "but a continuation of the prior" even where "benefits under the latter policy are different in various respects" from original because "rights to those additional benefits were fixed…pursuant to provisions of the original agreement.").

Just last year, a federal court applying California law relied on *Dunken* to reject a near-identical insurer theory. *Ameritas*, 2024 WL 4402028, at *4, *10. There too, the insurer sought a declaratory judgment that the converted permanent policy was void under Delaware law for lack of insurable interest at conversion. The term policy was initially issued in California, but was converted in Delaware by a successor owner that purchased the term policy in a life settlement transaction. *Id.* at *2, *10. Without addressing whether the policy would be void under Delaware law, the court held that California law controlled because California governed the original term policy: "***A converted life insurance policy is subject to the state law that governed the original life insurance policy, even if the policy was converted in a different state***." *Id.* at *10 (citing *Dunken*, 266 U.S. at 400). Consistent with *Ameritas*, a leading treatise recognizes: "The ability to convert term insurance into whole life coverage is, in effect, a right to convert the policy ***without evidence of insurability***." 2 *Law of Life and Health Insurance* § 5.20T (2025).

Hancock promised exactly that—a right to convert the Policy to permanent insurance without evidence of insurability. For that reason, JHUSA's counterclaim also runs headlong into another hornbook contract doctrine. When a contract "describes the particular situations" in which a rule applies, "an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted and excluded." *E.g.*, *Dunn Auto Parts, Inc. v. Wells*, 198 A.D.3d 1269, 1271 (4th Dep't 2021). Here, Hancock specifically promised, "We will not require evidence of insurability at the time of conversion, up to the face amount of this policy," unless the conversion was to a "joint last-to-die survivorship policy," for which Hancock would require evidence of

16

insurability.  Policy at -192. Weinstock Partners applied for coverage up to the face amount ($2.5 million) for a permanent policy (not a joint last-to-die survivorship policy). Hancock must issue the Converted Policy under these circumstances and may not disavow it.

Tellingly, JHUSA's pre-motion letter did not cite a single decision under any law (be it New York, New Jersey, or elsewhere) requiring an insurable interest to convert a policy. And JHUSA misrelies on its leading authority, *Gans v. Aetna Life Insurance Company*, 214 N.Y. 326 (1915). The *Gans* court simply held that the language of the suicide clause in the converted policy—which on its face ran from the date *of the converted policy*—"binds and obligates both of the parties." *Id.* In any event, in *Gans*, the converted policy "expresse[d] no dependence on or connection with the term policy." *Id.* at 331. In contrast to the policy at issue in *Gans*, the Converted Policy here was "issued in accordance with the Conversion privilege" under the Term Policy, Converted Policy at -8181, and Hancock expressly agreed not to require further evidence of insurability *and* to deem the incontestability period satisfied to the extent it was met in the term policy, *id.* at -8185.

JHUSA's other case, *Jarmon v. American Heritage Life Insurance Co.*, 267 A.2d 601, 602 (Del. Super. Ct. 1970), is also distinguishable. That case involved "conversion" from group coverage to individual coverage upon termination of employment, with the group policy continuing on as a separate contract even after the former employee elected to continue coverage under a new and separate policy. Under those circumstances, the court concluded that the individual policy "does not form a single contract" with the continuing group policy. *Id.* (citation omitted). Here, on the other hand, the Converted Policy replaces the original and is a "continuation" of the original.  Also unlike in *Jarmon*, where the individual policy (but not the original group policy) included a suicide clause and specified that it ran from the date of

conversion, Hancock expressly carried over the existing incontestability provision and period from the original to the Converted Policy.

JHUSA also argues that the Converted Policy must be a new policy because it deemed the Policy "canceled," used a new policy number, and offered new terms (such as indefinite coverage). But none of those facts alter the result, either. In *Dunken*, the insurer similarly deemed the policy "canceled," stamped "Surrendered" on the Policy, and issued a "new" policy with a new policy number in a different jurisdiction. 266 U.S. at 392; *see also Ameritas*, 2024 WL 4402028, at *2 (ruling that permanent policy was continuation of term policy, even though the conversion clause called it a "new policy" and was on a new policy form); *Hurley*, 513 S.W.2d at 898 (similar in context of rider option for additional insured). As these cases make clear: the law does not require the term and permanent policies to be identical. Rather, what matters is whether the converted policy was "*issued in pursuance of, and was dependent for its existence and its terms upon*, the express provisions of the contract contained in the first one." *Dunken*, 266 U.S. at 399. Just so here. What the Policy provided—a permanent life insurance policy on Mr. Weinstock's life without proof of insurability—is not available on the open market and is available only through the conversion privilege of the Policy. The Converted Policy is thus dependent for its existence on the Policy.

In its amended counterclaims, JHUSA also points to an email from one of Weinstock Partners' affiliates to prove what Weinstock Partners supposedly "understood at the time of the conversion." Counterclaim ¶¶ 47, 50. The email states that "a new contract # has been issued for the policy." *Id.* This also doesn't save JHUSA. That a new contract number was issued doesn't change the fact that the Converted Policy is dependent for its existence on the Policy, which is the relevant test. In addition, bedrock contract principles preclude using a party's "subjective intent"

18

(even assuming that is what the email shows) to interpret contract terms. *Faulkner*, 452 F. Supp. 2d at 378 ("[S]tatements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract" (citation omitted)).[3]

In sum, the Converted Policy is a continuation of the Policy. JHUSA's insurable interest challenge fails, because an insurable interest supported the Policy.

### C.    New York Law Controls, But JHUSA Loses in New Jersey Too

Essentially conceding that it loses if New York applies, JHUSA contends that New Jersey law governs the question of whether an insurable interest is required at time of conversion.[4] JHUSA's Pre-Mot. Ltr., at *3; Counterclaim ¶ 34. This argument fails for the same reason that JHUSA's "new policy" argument fails: because a conversion policy is merely a continuation of a term policy, questions as to its validity are governed by the law of the state in which the term policy was issued.

For example, in *Dunken*, the Court held that that a term life insurance policy issued in Tennessee, then converted in Texas, was subject to Tennessee (not Texas) law. 266 U.S. at 400. Because "the second policy" was issued pursuant to the terms of the Tennessee policy, "[t]he law of Tennessee entered into it and became part of it." *Id.* Similarly, *Ameritas* rejected the carrier's argument that Delaware law controlled, even though the policy was converted in Delaware, because the permanent policy was issued "as the result of…discharge of pre-existing obligations" created by a contract that California law governed. 2024 WL 4402028, at *4.

---

[3] JHUSA also points to emails in which *non-parties* to the contract refer to the Converted Policy as "new." Counterclaim ¶¶ 48-49. Their subjective understanding is doubly irrelevant. *See, e.g.*, *Henry v Agostini*, 12 Misc. 15, 17 (NY Com. Pl. 1895) (holding what third parties understood plan to mean was irrelevant).

[4] In certain respects, New Jersey and New York's insurable interest laws conflict. A policy under New Jersey law that lacks an insurable interest is void *ab initio* and such challenges are not barred by incontestability clauses. *Sun Life*, 208 A.3d at 851. In New York, challenges to insurable interest must be brought within the contestability period. *Caruso*, 73 N.Y.2d at 77.

Just so here: the Converted Policy was "issued in accordance with the Conversion privilege" on the Policy. Converted Policy at -8181. That means Hancock issued the Converted Policy to discharge its pre-existing obligations under a contract that was made in New York and was to be performed in New York. New York law controls the question of the validity of the Converted Policy.

To get around this, JHUSA relies on the choice of law provision in the Converted Policy, which states: "This Policy will be governed by and construed according to the laws of New Jersey." Converted Policy at -8180; Counterclaim ¶ 38. But that choice of law clause does not control here. JHUSA's counterclaim that the Converted Policy is void *ab initio* implicates the *validity*, not interpretation. A choice of law provision indicating that a contract "shall be 'governed' and 'construed'" under a jurisdiction's law does not "control our determination" when parties "challenge the *validity* of the contracts, not their *interpretation*." *Pegasus Aviation IV, Inc.,* 2012 WL 967301, at *5. It is, in fact, common for parties to "choose to have different issues involving their contract governed by the local law of different states." *Valley Nat'l Bank v Greenwich Ins. Co.,* 254 F. Supp 2d 448, 456 n.5(S.D.N.Y. Apr. 1, 2003) (quoting Restmt. 2d of Conflict of Laws § 187)). Just so here: the parties chose to have New Jersey law govern the interpretation of the Converted Policy, but that choice of law clause does not control the question of validity. New York governs that question—as *Dunken* and its progeny confirm.

JHUSA also makes much of the fact that JHUSA, rather than JHNY, issued the Converted Policy. *See* Counterclaim ¶¶ 34-35, 37, 40-42. The fatal problem for JHUSA is that the parties already contemplated this possibility under the Policy. The Policy allowed the owner to "convert this policy to **any permanent plan of insurance** offered for sale by the Company **or one of its affiliated companies**." Policy at-192.

But even assuming arguendo New Jersey law applied, JHUSA's counterclaim still fails. New Jersey requires only that a policy have an insurable interest at *inception*. Per New Jersey's insurable interest statute:

> No person shall procure or cause to be procured any insurance contract upon the life, health or bodily safety of another individual unless the benefits under that contract are payable to the individual insured or his personal representative, or to a person having, ***at the time when that contract was made***, an insurable interest in the individual insured.

N.J. Stat. Ann. § 17B:24-1.1.

"The general rule is that a term insurance policy that as a matter of contract right is convertible into another form, such as whole life, is a continuation of the policy." *See* 2 *Law of Life and Health Insurance* § 5.20T (2025) (collecting cases). Under that general rule, the "contract" at issue here was "made" in 2008, when Weinstock applied for the Policy on his own life. The Converted Policy confirms this: it expressly states that it was issued "in accordance with the Conversion privilege" under the Policy, Conversion Policy at -8181, and all of the provisions relating to contestability and insurability expressly relate back to the original issue date of the Policy. Policy at -192; Conversion Policy at -8185.

JHUSA fails to explain why New Jersey would deviate from that general rule. New Jersey's insurable interest law protects against "*stranger-originated* life insurance," *Sun Life*, 208 A.3d at 841, not *insured-originated* life insurance. None of the abuses that motivated the New Jersey legislature to outlaw STOLI are present. *See* N.J. Stat. Ann. § 17B:30B-18 (Senate Com. Comm. Stmt.) (cataloging reasons for anti-STOLI laws). Here, it was Mr. Weinstock himself who arranged for the insurance on his own life. Mr. Weinstock also designated a beneficiary, his wife, Counterclaim ¶ 17, who had an insurable interest in Mr. Weinstock's life (under New York or New Jersey law). N.J. Stat. Ann. § 17B:24-1.1(a)(3) ("An individual has an insurable interest in the life, health and bodily safety of another individual to whom he is closely related by blood or by law

21

and in whom he has a substantial interest engendered by love and affection."). Even after the sale to Weinstock Partners, Weinstock's wife Freida retained a 10% stake in the death benefit. Counterclaim ¶ 31.

Nothing in New Jersey's statutes or caselaw suggests that an insurable interest is required at the time a term policy converts. It is a basic principle of contract law that the assignee of an insurance policy stands in the shoes of the assignor. *See* Couch on Insurance, § 34:17, 3d ed. ("a life insurance policy is assignable, absolutely or by way of security, the same as any other chattel since it is a mere chose in action."). New Jersey embraces that principle. Under New Jersey's Viatical Settlements Act, "valid life insurance policies are assets that can be sold." *Sun Life*, 208 A.3d at 856; N.J. Stat. Ann. § 17B:30B-1 *et seq.* And in New Jersey, as in New York, the new owner of a sold life insurance policy receives all the same rights and privileges as the previous owner. *Metro. Life Ins. Co. v. Woolf*, 47 A.2d 340, 342 (N.J. App. Ct. 1946) ("An ordinary life insurance policy is but a chose in action; and the insured may make an absolute assignment of all such right, title and interest as he may have therein, subject to the limitations imposed by the contract."). That means when Weinstock Partners obtained the Policy, it obtained the right to convert built into the Policy.

In fact, the New Jersey legislature has recognized that limitations that apply to the issuance of new life insurance do not apply to conversions. For example, while New Jersey law prohibits viatical settlement contracts within two years of the issuance of an original policy, it allows such viatical settlement contracts within two years of *conversion* of a policy:

> a. *It is a violation of this act for any person to enter into a viatical settlement contract within a two-year period commencing with the date of issuance of the insurance policy **unless** the viator certifies to the viatical settlement provider that one or more of the following conditions have been met within the two-year period:*

> (1) ***The policy was issued upon the viator's exercise of conversion rights*** arising out of a group or individual life insurance policy, so long as the total amount of time covered under the conversion policy plus the time covered under the prior policy is at least 24 months.

N.J. Stat. Ann. § 17B:30B-10(a)(1). This provision confirms the New Jersey Legislature's intent that policies issued pursuant to conversion rights not be held to the same anti-STOLI standards as original policies.

JHUSA's reliance on the New Jersey Supreme Court's decision in *Sun Life* is misplaced. As that decision recognizes, "[s]o far as reasonable safety permits, it is desirable to give to life policies the ordinary characteristics of property." *Sun Life*, 208 A.3d at 847 (quoting *Grigsby*, 222 U.S. at 156). New Jersey strikes a public policy balance between legalizing the sale of policies on the secondary market and invalidating policies that lack an insurable interest at the outset: "An established secondary market exists for the sale of valid policies," where "buyers need not have an insurable interest in the life of the insured." *Id.* at 856-57. At the same time, New Jersey prohibits investors from procuring life insurance to prevent "a mere wager, by which the party taking the policy is directly interested in the early death of the assured." *Id.* at 844 (quoting *Warnock v. Davis*, 104 U.S. 775, 779 (1882)). For that reason, New Jersey focuses on whether there was an insurable interest "*at the time when that contract was made*," and not at a time later. Section 17B:24-1.1. In other words, the distinction between lawful life settlements and STOLI policies is "simply one of timing and certainty: whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale before it is issued." *Sun Life*, 208 A.3d at 848 (citation omitted). Mr. Weinstock procured the Policy himself. JHUSA does not allege—because it cannot allege—that Mr. Weinstock procured the Policy with intent to sell the Policy before it was issued. New Jersey's focus on timing is entirely consistent with *Dunken* and its progeny.

At bottom, JHUSA asks this Court, sitting in diversity, to craft a rule that no court, no legislature, and no regulator in New Jersey, or anywhere else, has ever adopted: that conversion rights cannot be exercised by a secondary owner. A federal court's role "sitting in diversity is not to adopt innovative theories that may distort established law." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Stroh Cos.,* 265 F.3d 97, 106 (2d Cir. 2001) (cleaned up). That is especially applicable where, as here, JHUSA's attempt to impose a second insurability requirement at the time of conversion finds no support in the Policy's language, the case law, or any compelling public policy. Mr. Weinstock procured a term life insurance policy on his own life. That policy allowed the successor owner, Weinstock Partners, to convert to a permanent policy. Having exercised that contractual right, Weinstock Partners is the lawful owner of a valid permanent life insurance policy: the Converted Policy. The Court should reject Hancock's attempt to cancel the Converted Policy and should instead enforce the agreement as written, not as Hancock would like to rewrite it.

## IV.    Conclusion

The Court should dismiss JHUSA's counterclaim with prejudice.

Dated:  August 29, 2025

                                              */s/ Ryan C. Kirkpatrick*
                                              Seth Ard (SDNY No.: SA1817)
                                              Ryan C. Kirkpatrick (SDNY No.: 5643721)
                                              Ari Ruben (SDNY No.: AR1986)
                                              SUSMAN GODFREY L.L.P.
                                              One Manhattan West, 50th Floor
                                              New York, New York 10001
                                              Telephone: (212) 336-8330
                                              Facsimile:  (212) 336-8340
                                              sard@susmangodfrey.com
                                              rkirkpatrick@susmangodfrey.com
                                              aruben@susmangodfrey.com

                                              Steven G. Sklaver (*pro hac vice*)

Glenn C. Bridgman (*pro hac vice*)
Halley Josephs (SDNY No.: HJ1108)
Kim Page (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
hjosephs@susmangodfrey.com
kpage@susmangodfrey.com

Amy V. Hall (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
ahall@susmangodfrey.com

*Attorneys for Plaintiffs*