# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ZABEN, LLC, and WEINSTOCK PARTNERS LLC, on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br><br>       v.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK and JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.)<br><br>                     Defendants. | Civil Action No. 7:23-cv-08178-CS-AEK |

**<u>DEFENDANT JHUSA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF WEINSTOCK PARTNERS' MOTION TO DISMISS JHUSA'S FIRST AMENDED COUNTERCLAIM</u>**

### TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.     Mr. Weinstock's Term Life Insurance Policy..................................................................2

II.    Plaintiff's New Universal Life Policy...........................................................................3

LEGAL STANDARD..............................................................................................................5

ARGUMENT .......................................................................................................................6

I.     The UL Policy Is Void *Ab Initio* Because It Is Not Supported by Insurable Interest..........6

II.    Plaintiff's Attempt To Evade New Jersey's Insurable Interest Law Is Meritless...............8

     A.    New Jersey Law Governs The Validity Of The UL Policy ....................................9

     B.    New York Law Cannot Govern Because The Term Policy And UL Policy Are
             Two Distinct, Independent Contracts ..................................................................11

          1.    The Term Policy Terminated and the Distinct UL Policy Issued .................11

          2.    Courts Have Repeatedly Concluded Converted-To Policies With
               Differences Similar To The Term and UL Policies Are Distinct,
               Independent Contracts ..................................................................................15

          3.    Plaintiff's Reliance on *Dunken* Is Misplaced................................................17

          4.    Plaintiff's Regulatory "Authority" Is Irrelevant...........................................20

     C.    Due Process Requires That New Jersey Law Apply ............................................20

III.    JHUSA Is Not "Rewriting" The Terms Of Any Policy....................................................22

     A.    JHUSA Did Not Require Evidence of "Insurability" ...........................................22

     B.    JHUSA Is Not Depriving Plaintiff Of Any Other Rights To Which
             It Is Entitled...................................................................................................24

          1.    The Conversion Option Is Not Absolute........................................................24

          2.    The Incontestability Provision Is Subject to New Jersey Law.......................26

CONCLUSION....................................................................................................................26

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126 (2d Cir. 2018)...........................9

*Aetna Life Ins. Co. v. Dunken*, 266 U.S. 389 (1924) ............................................. *passim*

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981)..............................................................20

*Ameritas Life Ins. Co. v. Wilmington Tr., N.A.*, 2024 WL 4402028 (C.D. Cal. Oct. 3, 2024) ................................................................................................................8, 19

*Ameritas Life Ins. Corp. v. Wilmington Tr., N.A.*, No. 24-6801 (9th Cir. filed Nov. 8, 2024) .................................................................................................................19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................5

*Baker v. Washington Nat'l Ins. Co.*, 823 F.2d 156 (5th Cir. 1987) ..............................19

*Bank of N.Y. Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632 (S.D.N.Y. 2007) ..................................................................................................................17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................5

*Binkley v. Mfrs. Life Ins. Co.*, 471 F.2d 889 (10th Cir. 1973) .......................................16

*Boyle v. Huff*, 257 N.J. 468 (2024) ..................................................................................24

*Burr v. Equitable Life Ins. Co. of Iowa*, 84 F.2d 781 (9th Cir. 1936)............................19

*Commonwealth Life v. Jackson*, 432 N.E.2d 1382 (Ind. Ct. App. 1982)........................19

*Contant v. Bank of Am. Corp.*, 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018).............20

*Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243 (S.D.N.Y. 2020) ......................................9

*EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220 (S.D.N.Y. 2012) ......................5

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) ..............................................................17

*Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424 (2d Cir. 2012) ......................................................................................................................9

*Gans v. Aetna Life Ins. Co.*, 214 N.Y. 326 (1915)................................................. *passim*

*Goldwater v. Jackson Nat'l Life Ins. Co.*, 555 F. Supp. 1022 (N.D. Cal. 1983) ...........19

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank*, 747 F.3d 44 (2d Cir. 2014) ................................................................................................17

*Jarmon v. Am. Heritage Life Ins. Co.*, 267 A.2d 601 (Del. Super. Ct. 1970).........................15, 16

*Johnson v. Metro. Life Ins. Co.*, 79 A.D.3d 450 (N.Y. App. Div. 2010)......................................10

*Kallman v. Equitable Life Assur. Soc. of U.S.*, 248 A.D. 146 (N.Y. App. Div. 1936) ................................................................................................22

*Lincoln Nat'l Life Ins. Co. v. Inzlicht-Sprei*, 2020 WL 1536346 (E.D.N.Y. Mar. 31, 2020) ................................................................................................10

*Lincoln Nat'l Life Ins. Co. v. Ret. Value LLC*, 2024 WL 3913090 (D.N.J. Aug. 20, 2024) ..........................................................................................6, 10, 11

*Mass. Mut. Life Ins. Co. v. Thacher*, 15 A.D.2d 242 (N.Y. App. Div. 1961) ............................22

*Mega-Trends Int'l, Inc. v. Beeba's Creations, Inc.*, 1995 WL 322153 (S.D.N.Y. May 26, 1995) ................................................................................................11

*Occidental Life v. Hurley*, 513 S.W.2d 897 (Tex. Civ. App. 1974) ...........................................19

*Phila. Life Ins. Co. v. Erwin*, 182 S.E. 209 (Va. 1935)................................................................19

*Provident Life & Accident Ins. Co. v. Kegley*, 199 Va. 273 (1957)......................................15, 16

*Rescuecom Corp. v. Google Inc.*, 562 F.3d 123 (2d Cir. 2009)......................................................5

*Rocker v. Cardinal Bldg. & Loan Ass'n of Newark*, 179 A. 667 (N.J. 1935)..............................24

*Silliman v. Int'l Life Ins. Co.*, 174 S.W. 1131 (Tenn. 1915).......................................................19

*State v. Ryan*, 249 N.J. 581 (2022) ..............................................................................................7

*Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 238 N.J. 157 (2019)..............................................................................................1, 6, 23

*Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175 (2d Cir. 2001) ........................................12

*Twitchell v. Town of Pittsford*, 483 N.Y.S.2d 524 (N.Y. App. Div. 1984)..................................11

*U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016).........................................................................9, 10

*Vasquez v. Glassboro Serv. Ass'n, Inc.*, 83 N.J. 86 (1980)........................................................24

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560 (E.D.N.Y. 2011) ...................................5

iv

*Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405 (2d Cir. 2025) ....................................................5

## STATUTES, RULES, AND REGULATIONS

N.J. Stat. § 17B:17-20 ....................................................................................................................6

N.J. Stat. § 17B:17-27(a)(2) ...........................................................................................................6

N.J. Stat. § 17B:24-1.1 ............................................................................................................. *passim*

N.J. Stat. § 17B:30B-10(a) .........................................................................................................7, 8

N.Y. Comp. Codes R. & Regs. tit. 11, § 380.6(d) .......................................................................23

N.Y. Ins. Law § 325 .....................................................................................................................25

## OTHER AUTHORITIES

1A Couch on Ins. § 7:1 (3d 2025)..................................................................................................15

1A Couch on Ins. § 8:73 (3d 2025)................................................................................................16

2 Couch on Ins. § 33:68 (3d 2025) ................................................................................................22

4-23 Appleman on Ins. L. & Prac. Archive § 23.1 (2d 2011) .................................................2, 22

17A West's McKinney's Forms Ests. & Surrogate Prac. § 15:18......................................................3

17A West's McKinney's Forms Ests. & Surrogate Prac. § 15:20......................................................3

Gen. Couns. Op. 6-13-2007 (#1), 2007 WL 1975579, at *2 (June 13, 2007) ..............................20

Restatement (Second) of Contracts § 230......................................................................................11

## INTRODUCTION

New Jersey requires that "*any* insurance contract" must be supported by insurable interest in the individual insured "at the time when *that* contract was made."  N.J. Stat. § 17B:24-1.1(b) (emphasis added).  "*Any* insurance contract" that is not supported by insurable interest "at the time when *that* contract was made" is void *ab initio*.  *Id.* (emphasis added); *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 238 N.J. 157, 175 (2019).  Weinstock Partners, LLC ("Weinstock Partners" or "Plaintiff") does not even contest, because it cannot, that it had no insurable interest in the life insured at the time the life insurance contract that is the subject of JHUSA's counterclaim was made.  That is dispositive of its Motion.

To avoid that inevitable conclusion, Weinstock Partners: (1) asks this Court to embrace a legal fiction that a distinct, independent contract entered into in accordance with a conversion option in a prior, terminated New York contract is, as a matter of law, the same contract as the prior, terminated contract such that New York insurable interest law applies; (2) incorrectly asserts one entity (JHUSA) is "rewriting" the terms of a prior contract issued by a different entity (JHNY); and (3) mistakenly asserts that JHUSA asks this Court to adopt a rule that policy conversion rights cannot *ever* be exercised by a secondary owner.  Not only do Weinstock Partners' attempts at misdirection fail on their own terms, but they cannot change the fact that the life insurance contract that is the subject of JHUSA's counterclaim is void for lack of insurable interest under New Jersey law.

*First*, Plaintiff's argument that the two independent contracts here should, as a matter of law, be treated as one misapplies the Supreme Court's since-abrogated decision in *Aetna v. Dunken*.  In any event, *Dunken* considered the *facts before it* to conclude that a converted-to policy was merely a continuation of the original.  When considering the facts pleaded *here*, and applying

the reasoning in *Dunken* and other authority, JHUSA has plausibly pleaded the existence of two distinct, independent contracts, the second of which is governed by New Jersey law.

*Second*, JHUSA is not "rewriting" the terms of the original term policy or any other contract. It is hornbook law that no one—including JHUSA, JHNY, and Weinstock Partners—can contract around legislative requirements or established public policy. 4-23 Appleman on Ins. L. & Prac. Archive § 23.1 (2d 2011) ("If, of course . . . a policy provision contravenes the law, such contract or contractual provision is void."). It is only that hornbook principle that JHUSA has invoked here.

*Third*, JHUSA is not asking this Court to adopt a *per se* rule that conversion rights cannot be exercised by a secondary owner. All contractual rights exist to the extent consistent with legislative requirements or established public policy. Secondary owners with insurable interest in the life of the insured—*e.g.*, family members, business associates, businesses, trusts for the benefit of an insured or a relative—have every right to convert a term policy to a valid permanent policy in New Jersey. But, as a matter of law, investors without insurable interest and wagering on lives of insureds do not.

As set forth below, JHUSA has plausibly pleaded that the converted-to policy is void *ab initio* under New Jersey law and that New Jersey law governs the validity of the converted-to policy. JHUSA's First Amended Counterclaim easily withstands Plaintiff's Motion.

## BACKGROUND

## I. Mr. Weinstock's Term Life Insurance Policy

In February 2008, Israel Weinstock ("Mr. Weinstock") applied to John Hancock Life Insurance Company of New York ("JHNY") for a term life insurance policy insuring his own life. JHUSA's First Amended Counterclaim (ECF No. 104) ("CC") ¶ 16. A term life insurance policy

2

provides insurance coverage for a specific amount for a defined period of years for a fixed annual premium.  *See* 17A West's McKinney's Forms Ests. & Surrogate Prac. § 15:20.

Mr. Weinstock lived in New York and was 67 years old when he applied for the term policy.  CC ¶ 17.  On June 19, 2008, JHNY, an entity only authorized to issue life insurance in New York, issued in New York a term life insurance policy to Mr. Weinstock with the policy number 81729576, a policy date of April 28, 2008, and a face amount of $2.5 million ("Term Policy").  *Id.* ¶ 18; Ex. A.[1]

The Term Policy provided Mr. Weinstock with a conditional option to request conversion of the Term Policy to a permanent life insurance policy if certain requirements were satisfied ("Conversion Option").  CC ¶ 19.  To exercise this Conversion Option, Mr. Weinstock would not have to undergo new medical underwriting, as he did for the Term Policy, or present additional evidence of insurability.  *Id.*

## II.  <u>Plaintiff's New Universal Life Policy</u>

In March 2016, eight years after the Term Policy was issued and 13 months after acquiring Mr. Weinstock's Term Policy, Plaintiff prepared to submit an application to convert the Term Policy to a "*new Weinstock UL* [*i.e.*, universal life] *policy*."  CC ¶ 48; Ex. L at -685 (emphasis added).  Unlike a term life insurance policy, a universal life insurance policy provides insurance coverage for as long as the policyowner pays sufficient premiums to cover cost of insurance and other charges.  *See* 17A West's McKinney's Forms Ests. & Surrogate Prac. § 15:18.  The premiums are flexible, the cost of insurance rates used to calculate the cost of insurance charges can change, the policy accumulates a cash value on which the insurer credits interest, and the exposure to the company is the difference between the policy face amount and the cash surrender value.  *Id.*

---

[1]      "Ex." refers to exhibits to JHUSA's First Amended Counterclaim (ECF No. 104).

On April 18, 2016, ten days before the Conversion Option expired, Weinstock Partners applied to convert the Term Policy to a universal life insurance policy ("Conversion Application"). CC ¶ 33; Ex. E.  Weinstock Partners emailed JHUSA to confirm that it had submitted its "first Piece of *New business*," and inquired about what "needs to be the effective date of the *new contract*."  CC ¶ 49; Ex. M at -619, -628 (emphasis added).

Mr. Roth signed the Conversion Application on behalf of Weinstock Partners in New Jersey.  CC ¶ 34.  The Conversion Application was submitted on a New Jersey-specific form for a product called "Protection UL" that was to be issued in New Jersey by JHUSA, a distinct entity from JHNY licensed to issue life insurance in New Jersey but not New York.  At the time of the application, the insured, Mr. Weinstock, lived in New Jersey.  *Id.*  Weinstock Partners purposefully elected to apply for a New Jersey rather than New York policy because, for the product it selected, "pricing in NJ is slightly more advantageous than it is in NY."  CC ¶ 34; Ex. G at -690.

For the new universal life policy to issue in New Jersey, Weinstock Partners had to attest to JHUSA that the "solicitation" and "negotiation" of the new policy took place exclusively outside of New York and that the new policy was applied for, issued, and delivered outside New York. CC ¶ 35, Ex. I at -940.  Weinstock Partners further affirmed that "all aspects of this sale from initial discussion to policy del[ivery]" took place in New Jersey.  Ex. I at -940.  The New York non-solicitation form was among various requirements that had to be satisfied before the new universal life policy could issue.  *See* Ex. A at -192 (noting requirements insured must meet for new policy); Ex. H at -508 (identifying "Requirements Needed for Policy Issue").  Upon receipt of all requirements, JHUSA issued a new Protection UL policy insuring the life of Mr. Weinstock to Plaintiff ("UL Policy").  Ex. E.

The UL Policy was issued in New Jersey and had a policy date of April 28, 2016, an issue date of May 10, 2016, an insured age of 75, and a face amount of $2.5 million. CC ¶ 37; Ex. E at -147. The UL Policy stated that it was governed by the laws of New Jersey and that the jurisdiction of issue was New Jersey, CC ¶ 38; Ex. E at -147, -180, and included an integration clause stating "[t]he entire contract between the applicant and us consists of the policy, such [Conversion Application], and any riders and endorsement." Ex. E at -178. The insurance agent for Plaintiff who assisted in obtaining the UL Policy received a new commission upon issuance of the UL Policy. CC ¶ 43; Ex. K at -452.

By the terms of the Term Policy and the Conversion Application, and based on Weinstock Partners' request, the Term Policy terminated and all JHNY contractual obligations ceased upon issuance of the UL Policy. CC ¶ 39; Ex. J at -910.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint need only "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss, a court must "accept as true all of the factual allegations set out" in the complaint, "draw inferences from those allegations in the light most favorable" to the complainant, and "construe the complaint liberally." *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 411 (2d Cir. 2025) (quoting *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009)). "On a motion to dismiss, the Court may consider 'facts alleged in the complaint and documents attached to it or incorporated in it by reference.'" *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 224 n.2 (S.D.N.Y. 2012) (Seibel, J.) (quoting *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011)).

## ARGUMENT

### I.    The UL Policy Is Void *Ab Initio* Because It Is Not Supported by Insurable Interest

New Jersey law is clear that *all* life insurance contracts issued in New Jersey must comply with the New Jersey Insurance Code, including the insurable interest requirement in N.J. Stat. § 17B:24-1.1(b).  *See* N.J. Stat. § 17B:17-20 (New Jersey Insurance Code applies to "all policies delivered or issued for delivery in [New Jersey]"); N.J. Stat. § 17B:17-27(a)(2) (New Jersey Insurance Code applies to "every policy delivered or issued for delivery in New Jersey by an authorized foreign insurer").  Indeed, the District of New Jersey has found, applying New Jersey law, that individual policies issued and delivered in New Jersey under a group policy that was issued in New York still "must conform with New Jersey's insurance provisions."  *See Lincoln Nat'l Life Ins. Co. v. Ret. Value LLC*, 2024 WL 3913090, at *11-12 (D.N.J. Aug. 20, 2024) ("New Jersey law . . . has a provision that provides that insurance policies delivered in the state must conform with *New Jersey's* insurance provisions.").  New Jersey is also clear that a policy issued without insurable interest is void *ab initio*—none of its provisions have any effect.  *Sun Life*, 238 N.J. at 187.

There is no dispute that Plaintiff had no insurable interest in Mr. Weinstock's life when the UL Policy issued.  *See generally* Mot.  Settled principles of New Jersey law therefore entitle JHUSA to a declaratory judgment that the UL Policy is void *ab initio* and denial of Plaintiff's Motion.[2]

---

[2]    That Mrs. Weinstock retained a 10% interest in the UL Policy's death benefit does not satisfy New Jersey's insurable interest requirement.  *See Ret. Value LLC*, 2024 WL 3913090, at *17 (declaring two life insurance policies void *ab initio* even though insured's son remained entitled to receive "10% of the death benefits" when, as here, policies were procured by third-party investor).  Plaintiff rightly does not contend otherwise.

Plaintiff nonetheless contends that New Jersey's insurable interest requirements does not apply to the UL Policy because New Jersey specifically exempts converted-to policies from a two-year waiting period before life insurance policies can be sold to secondary owners. Mot. 21-23. And that exemption, it contends, "confirms the New Jersey Legislature's intent that policies issued pursuant to conversion rights not be held to the same anti-STOLI standards as original policies." *Id.* at 23. Plaintiff also argues that *Ameritas*, a non-binding decision from the Central District of California applying California insurable interest law and that is currently on appeal to the Ninth Circuit, demonstrates that insurable interest is not required for a converted-to policy in New Jersey under New Jersey law. Mot. 16. Not so.

*First*, nothing in the New Jersey law exempting converted-to policies from a two-year waiting period before the policy can be sold exempts converted-to policies from New Jersey's absolute requirement that "[n]o person shall procure or cause to be procured *any insurance contract* . . . unless the benefits under that contract are payable to . . . a person having, *at the time when that contract was made*, an insurable interest in the individual insured." N.J. Stat. § 17B:24-1.1(b) (emphasis added). If the Legislature intended to exempt converted-to policies from the insurable interest requirement applicable to "any insurance contract," as Plaintiff contends, the Legislature would have said so expressly. *See, e.g.*, *State v. Ryan*, 249 N.J. 581, 599 (2022) ("It is the Legislature's prerogative to impose a requirement in one context but not another; it is our duty to treat that distinction as meaningful.").

Indeed, if Plaintiff is correct that converted-to policies are not subject to the requirements of all insurance contracts, there would be no need for the very exemption on which Plaintiff relies. Mot. 22-23. The New Jersey life settlement statute creates a default rule that no life insurance policy may be sold within two years of issuance. *See* N.J. Stat. § 17B:30B-10(a). Recognizing

7

that the two-year default rule would apply separately to both an original term policy and a converted-to policy, the Legislature created an exception for converted-to policies, allowing the settlement of a converted policy "so long as the total amount of time covered under the conversion policy plus the time covered under the prior policy is at least 24 months." N.J. Stat. § 17B:30B-10(a)(1). If New Jersey considered the original term policy (*i.e.*, the "prior policy") and the converted policy (*i.e.*, the "conversion policy") the "same" policy, there would be no need for an exception; the two years would run from when the term policy issued.

*Second*, in addition to incorrectly concluding that the term and converted-to policies in that case were one and the same, *see infra* at 19 n.8, *Ameritas* (on which Plaintiff relies) considered California's—not New Jersey's—law of insurable interest. California only requires insurable interest "when the insurance takes effect." *Ameritas Life Ins. Co. v. Wilmington Tr., N.A.*, 2024 WL 4402028, at *3 (C.D. Cal. Oct. 3, 2024). In contrast, New Jersey's insurable interest statute requires insurable interest for "*any* insurance contract . . . at the time when *that* contract was made." N.J. Stat. § 17B:24-1.1(b) (emphasis added). Regardless of when insurance on Mr. Weinstock's life "took effect," it is beyond dispute that the UL Policy contract was "made" in 2016, when Plaintiff had no insurable interest in Mr. Weinstock's life. Indeed, neither the UL Policy nor the insurance product that the UL Policy provides existed when the Term Policy issued in 2008. CC ¶ 37 & n.1. Whatever the outcome under California law, New Jersey law requires finding that the UL Policy was void *ab initio* for lack of insurable interest.

## II.    Plaintiff's Attempt To Evade New Jersey's Insurable Interest Law Is Meritless

Knowing the inevitable result under New Jersey law, Plaintiff argues that the UL Policy is governed not by the laws of New Jersey (where the UL Policy was applied for, negotiated, issued, and delivered) but by the laws of New York (where the now-terminated Term Policy was issued).

Mot. 12-19. But Plaintiff fails to establish, as it must, why a necessary choice of law analysis requires the application of New York law, misapplies caselaw in support of a fiction that the UL Policy is a "continuation" of the Term Policy, and completely misreads New Jersey's law of insurable interest. Plaintiff's arguments have no merit.

### A.    New Jersey Law Governs The Validity Of The UL Policy

There can be no doubt that New Jersey is the center of gravity of the UL Policy and therefore New Jersey law governs its validity.[3]

"[A] federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). "Under the law of New York . . . the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Id.* Where a conflict exists, "New York looks to the 'center of gravity' of a contract to determine choice of law." *Id.* Courts "consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (internal citations omitted). "In disputes involving life insurance, this approach often results in the dispute being governed by the law of the state where the insured resided at the time the policy was applied for." *U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 2016 WL 8116141, at *11 (E.D.N.Y. Aug. 30, 2016).

---

[3]     At minimum, JHUSA has alleged sufficient connection between the UL Policy and New Jersey to overcome a motion to dismiss based on the choice of law question. *See Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 255 (S.D.N.Y. 2020) ("[B]ecause a 'choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage.'").

It is undisputed that there is an actual conflict here between New York and New Jersey insurable interest and contestability law.  *See* Mot. 19 n.4; *see also Lincoln Nat'l Life Ins. Co. v. Inzlicht-Sprei*, 2020 WL 1536346, at \*14 (E.D.N.Y. Mar. 31, 2020) (conflict where "STOLI policies are void *ab initio* in New Jersey" but "merely voidable in New York").  And it also cannot be disputed that the facts here demonstrate that New Jersey was the center of gravity of the UL Policy.  *See Johnson v. Metro. Life Ins. Co.*, 79 A.D.3d 450, 453 (N.Y. App. Div. 2010) (New Jersey law applied where "New Jersey was the place of contracting and defendant was led to believe that [New Jersey was] the location of the insured risk").  The insured lived in New Jersey when Plaintiff applied for the UL Policy.  CC ¶ 34.  Plaintiff signed the Conversion Application in New Jersey and attested that the solicitation and negotiation and "all aspects" of the sale of the UL Policy and policy delivery occurred in New Jersey.  CC ¶¶ 34-35; Ex. I at -940.  The UL Policy was issued on a form approved for issue in New Jersey but not New York and by a company licensed to do business in New Jersey but not New York.  CC ¶¶ 37, 41.  And Plaintiff specifically chose New Jersey as the place of issue to obtain more favorable pricing for the product to which it sought to convert.  *Id.* ¶ 34. This close nexus to New Jersey commands a finding that New Jersey is the center of gravity and that New Jersey law should govern the dispute regarding the validity of the UL Policy.  *See Ret. Value*, 2024 WL 3913090, at \*11.[4]

*Retirement Value* is instructive.  There, the court considered whether New York or New Jersey law governed the validity of two policies issued pursuant to a single group life policy.  2024 WL 3913090 at \*5, \*9-12.  The group policy was delivered in New York; the individual policies

---

[4]    New Jersey also has the stronger governmental interest here given New Jersey's interest in ensuring that life insurance policies issued or delivered in New Jersey comply with New Jersey law.  *See supra* at 6; *U.S. Bank*, 2016 WL 8116141, at \*13 (Delaware had "the dominant governmental interest" in policy delivered in Delaware).

were applied for, issued, and delivered in New Jersey. *Id.* at *9, *10. Critically, as with the UL Policy, the individual policies were issued along with an attestation that they were "principally negotiated, issued and delivered in the state where the application was signed" which was New Jersey." *Id.* at *11. And, as with JHUSA, the insurer in *Retirement Value* "was not even licensed to issue policies . . . unless the policy was delivered *outside* of New York." *Id.* On these facts, the court emphatically confirmed two prior determinations that "New Jersey has the most significant relationship." *Id.* at *12. The same outcome is compelled here on similar facts.

**B.     New York Law Cannot Govern Because The Term Policy And UL Policy Are Two Distinct, Independent Contracts**

To avoid the application of New Jersey law, Plaintiff clings to the issuance of the Term Policy in New York to argue that because the UL Policy is a "continuation" of the Term Policy, New York law governs. Plaintiff's argument belies the facts alleged in JHUSA's counterclaim regarding the fundamental differences between the Term Policy and UL Policy, which establish that the UL Policy is a distinct, independent contract.

**1.     The Term Policy Terminated and the Distinct UL Policy Issued**

It is blackletter law that a contract automatically terminates upon the occurrence of a specified termination contingency. *See* Restatement (Second) of Contracts § 230. And upon that automatic termination, *all* obligations of the contracting parties cease. *See Twitchell v. Town of Pittsford*, 483 N.Y.S.2d 524, 525 (N.Y. App. Div. 1984) ("When a contract is terminated, such as by expiration of its own terms, the rights and obligations thereunder cease."), *aff'd,* 66 N.Y.2d 824 (N.Y. 1984). A new, independent contract is formed when contracting parties establish new rights and obligations supported by independent consideration. *See Mega-Trends Int'l, Inc. v. Beeba's Creations, Inc.*, 1995 WL 322153, at *3 (S.D.N.Y. May 26, 1995) (contract was new agreement because "its elements wholly supersede the obligations of the original contract between [the

parties]"); *see also Gans v. Aetna Life Ins. Co.*, 214 N.Y. 326, 331 (1915) (holding post-conversion life insurance policy was "independent, complete and isolated contract" where "premium to be paid, and the rights, privileges, advantages and obligations of both parties under [the new contract] are essentially and substantially different from those under the [original] term policy").  And, where, as here, a contract contains an integration clause, that clause evidences the full scope of the parties' agreement.  *See, e.g.*, *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 191 (2d Cir. 2001) ("unequivocal and conspicuous integration clause" supports presumption that written agreement is complete).

Here, by its express terms, and at Plaintiff's request, the Term Policy *terminated* as of the date on which Plaintiff requested that it be converted to the new UL Policy.  Ex. A at -191; Ex. J at -910.  *Separate* parties to the new contract then considered *anew* the elements that would form the new contract and then undertook a *separate* negotiation process that culminated in a distinct, independent contract with *distinct* counterparties.  For example, Plaintiff considered, prior to issuance of the UL Policy, for what product it should apply and in which state.  Ex. G at -690 ("You may want to consider NJ [product] as the pricing in NJ is slightly more advantageous than it is in NY at this time").  Plaintiff and JHUSA also separately negotiated the issue age and effective date for the new policy as well as the premium payment arrangements.  Ex. M at -617- 19, -628 (Plaintiff's broker asking "what will or needs to be the *effective date* of the *new contract to save age*" and whether proposed payment arrangements are acceptable (emphasis added)).  The attestation form Plaintiff signed as one of the requirements for issue of the UL Policy affirmed that there was a distinct "solicitation" and "negotiation" process for the UL Policy, which occurred, as it had to, in a different state than for the Term Policy.  Ex. I at -940 (Plaintiff attesting that "solicitation and negotiation [of the UL Policy took] place outside the State of New York").  In

other words, the parties to the UL Policy undertook all the telltale signs of forming a new contract. These pleaded facts create, at minimum, a plausible inference that the UL Policy is a new, distinct, and independent contract.

That the UL Policy is a new contract is only buttressed by looking at the differences between the two policies. The UL Policy was issued: (i) by JHUSA rather than JHNY; (ii) in New Jersey instead of New York; (iii) pursuant to a different policy application; (iv) on a different policy form authorized for issue in different states (which did not even exist when the Term Policy was issued); (v) with a different policy number; (vi) with a different issue date; (vii) with different issue ages for the insured. *See supra* at 2-3; CC ¶¶ 18, 37. The UL Policy also contained fundamentally different insurance coverage than the Term Policy: (i) the UL Policy coverage would last for the life of the insured provided sufficient premiums are paid to cover the charges for each year the policy is inforce—rather than for a limited ten-year term; and (ii) the exposure to the company presented by the UL Policy is the difference between the policy face amount and the cash surrender value—rather than the full face amount. *See infra* at 16. Moreover, the UL Policy required independent consideration in exchange for that different coverage than was required by the Term Policy: variable cost of insurance charges rather than a fixed, pre-determined annual premium. *See supra* at 2-3. And the UL Policy contained an integration clause that limited the agreement to the UL Policy, the Conversion Application, and any riders and endorsement—it referenced *nothing* in the Term Policy or the application for the Term Policy. Ex. E at -178.

The New York Court of Appeals' decision in *Gans*—a decision of the highest court of the state Plaintiff claims governs this dispute—is directly on point. At issue in *Gans* was whether a permanent policy issued pursuant to a conversion right was a new, independent contract. The permanent policy was issued pursuant to an option in the term policy allowing the term policy to

13

be "exchanged without medical re-examination for a new policy upon any plan then in use by said company." 214 N.Y. at 329. As with the UL Policy, the insured in *Gans* made a *separate* written application for the permanent policy without additional underwriting, the new policy contained an integration clause substantively indistinguishable from the one in the UL Policy, and the policy contained terms that were substantially different than the term policy. *Id.* at 331. On these facts, the New York Court of Appeals concluded that the new, permanent policy was "in form and substance an independent, complete and isolated contract." *Id.* The court reasoned that the separate application "in consideration of which the policy was issued" was "strong confirmation of the integrity" of the separate terms of the second policy, which was further evidenced by the integration clause that limited the scope of the new contract to the new policy and the new application. *Id.* The court further found that the "premium to be paid, and the rights, privileges, advantages, and obligations of both parties under [the second, new policy] are essentially and substantially different from those under the term policy." *Id.*

Plaintiff's only serious rejoinder to *Gans* is to assert that the new permanent policy in *Gans* "expresse[d] no dependence on or connection with the term policy," Mot. 17 (citing *Gans*, 214 N.Y. at 331), whereas the UL Policy contained an endorsement stating that it was "issued in accordance with the Conversion privilege" in the Term Policy, *id.* at 17-18 (citing Ex. E at -181), which endorsement purportedly "carried over" certain provisions from the Term Policy.[5] Not so.

*First*, the terms which Plaintiff asserts were carried over—that the incontestability and suicide periods in a converted-to policy would be deemed satisfied, Mot. 17-18—exist

---

[5]    Plaintiff also asserts that *Gans* concerned the validity of a suicide clause and that JHNY agreed not to require evidence of "insurability." Mot. 17. But that *Gans* concerned the validity of a suicide clause is irrelevant to the question of whether the permanent policy was a new, distinct policy from the term policy, and, the term policy in *Gans*, like the Term Policy here, also agreed not to require evidence of insurability. *See also supra* at 13-14.

independently in the UL Policy, specifically in the Conversion Application: the "[s]uicide and [i]ncontestability periods will be deemed to have been met to the same extent that they were met under the term policy," Ex. E at -185. Giving the endorsement the meaning Plaintiff assigns would render the terms in the Conversion Application irrelevant.

*Second*, to the extent Plaintiff contends that the endorsement "carries over" from the Term Policy a commitment not to require evidence of insurability for the UL Policy, that "dependence" or "connection" between the UL Policy and the Term Policy is indistinguishable from the manner in which the converted-to policy in *Gans* was "dependent" on or "connected" with the original policy. Both here and in *Gans*, a new policy was issued in accordance with a conversion right in an existing policy without having to undergo underwriting. *Gans*, 214 N.Y. at 329-30. And, in any event, it is the endorsement itself—not any provision "carried over" from the Term Policy— that acknowledges the absence of separate underwriting and that the risk classification for the insured for the UL Policy is the same as for the Term Policy.

> 2.    Courts Have Repeatedly Concluded Converted-To Policies With Differences Similar To The Term and UL Policies Are Distinct, Independent Contracts

The differences between the Term and UL Policies are substantially the same differences between individual certificates issued under group policies and converted-to individual life insurance policies that courts consistently find give rise to a new and distinct policy. *See, e.g.*, *Jarmon v. Am. Heritage Life Ins. Co.*, 267 A.2d 601, 602 (Del. Super. Ct. 1970); *Provident Life & Accident Ins. Co. v. Kegley*, 199 Va. 273, 276-77 (1957).

A group life insurance policy provides life insurance coverage to a group of individuals, each of whom are issued a certificate specifying the individual terms and amount of coverage. 1A Couch on Ins. § 7:1 (3d 2025). Group policies and individual certificates contain provisions

permitting conversion to an individual life insurance policy offered by the same carrier without additional underwriting. *Id.* § 8:73. And courts considering whether the converted-to policies are distinct, independent contracts have uniformly held that they are. That is because: (i) the converted-to individual policy had its own standalone, integrated terms different from the group policy and individual certificate, *see Binkley v. Mfrs. Life Ins. Co.*, 471 F.2d 889, 892-93 (10th Cir. 1973); *Provident Life*, 199 Va. at 277-79; *Jarmon*, 267 A.2d at 602-03; (ii) the converted-to individual policy terms were not dependent on any aspect of the group policy, *see Provident Life*, 199 Va. at 279; and (iii) the individual policy altered the nature of the risk assumed by the life insurance company—that is, the individual policy insured the single life pursuant to the terms of the individual policy and not the group policy, *see Binkley*, 471 F.2d at 892; *Provident Life*, 199 Va. at 277; *Jarmon*, 267 A.2d at 602. These same differences exist between the Term Policy and the UL Policy. The UL Policy has its own standalone terms. The terms of the UL Policy are not dependent on any of the terms of the Term Policy. And, as with converted-to individual policies, the UL Policy here altered the nature of the risk assumed by the life insurance company: the risk was transferred from JHNY to JHUSA, two distinct entities subject to distinct risk-related regulatory requirements, and there was a shift of the risk to the policyholder in the form of non-guaranteed cost of insurance rates. The exposure to JHUSA of the UL Policy is also the difference between the policy face amount and the cash surrender value, whereas the exposure to JHNY of the Term Policy was the full face amount.

Plaintiff's attempts to distinguish these cases ignore their reasoning and manufacture distinctions that make no difference. *See* Mot. 17. That a group policy "continues" after the conversion to an individual policy says nothing about the extent to which the new policy is governed by unique, integrated terms that in no way depend upon the terms of the group policy,

16

or the extent to which the risk insured by the insurance company has fundamentally changed.  It is frequently the case that a term policy continues to exist alongside a converted-to policy when less than the full face value of the term policy is converted to a permanent policy.  *See* Ex. A at -192 (permitting conversion of "*up to* the face amount of this policy" (emphasis added)).  And any reliance on the endorsement stating the UL Policy was "issued in accordance with the Conversion privilege" in the Term Policy," *id.* at 17 (citing Ex. E at -181), fails for the same reason Plaintiff cannot escape *Gans*: Plaintiff nowhere explains—as it must—that the endorsement unambiguously "carries over" terms from the Term Policy.  *See supra* at 14-15; *see Bank of N.Y. Tr., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities.").

### 3.    Plaintiff's Reliance on *Dunken* Is Misplaced

Plaintiff relies extensively on *Aetna Life Ins. Co. v. Dunken*, 266 U.S. 389 (1924), ignoring that, in determining that the converted-to policy was a "continuation" of the original policy, the court applied federal common law abrogated by *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).[6]  To the extent *Dunken*'s federal common law contractual analysis has any continued viability, its reasoning demonstrates that the UL Policy is a distinct, independent contract from the Term Policy.

In *Dunken*, the conversion right afforded the conversion of a seven-year term policy to a predetermined 20-payment life commercial policy with contractual terms set at the time the term

---

[6]    Plaintiff's reliance on *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44 (2d Cir. 2014) is inapposite.  *Hillside* acknowledges that the remaining federal common law of contract, which applies to *federal government contracts*, is informed by "general principles of contract law."  *Id.* at 49.  It does not hold that pre-*Erie* federal common law *reflected* "general principles of contract law."  In any event, post-*Erie*, federal common law of contract cannot displace contrary state law that applies in this diversity action.

policy was issued.  *Dunken*, 266 U.S. at 391.  The converted-to 20-payment policy bore the same

date and was issued at the same issue age as the term policy.  *Id.*  The application for the converted-

to policy "stipulated that the statements and answers in the original application . . . should be the

basis of the new policy and form part of the same" and the converted-to policy "conform[ed] to

the express terms of the agreement in the original policy."  *Id.* at 392.  Critical to the court's holding

was that, on the facts before it, "[n]othing was left to future agreement" because the "terms of the

new policy were fixed when the original policy was made" and the converted-to policy was "issued

not as the result of any new negotiation or agreement."  *Id.* at 399-400.  As the Supreme Court

concluded, "[i]f the insurance company had refused to issue the second policy upon demand, the

insured could have compelled it by a suit in equity for specific performance."  *Id.* at 400.

These circumstances are markedly different from those leading to the issuance of the UL

Policy.  Not only were the terms of the UL Policy not "fixed when the original policy was made,"

they were *unknowable*.  Indeed, the UL Policy could not be the "consummation of an alternative

specifically afforded" by the Term Policy because the contracting parties did not (and could not)

know when the Term Policy issued what policy would be applied for years later—the Protection

UL product, which the UL Policy is, did not even exist until 2015, *seven* years after the issuance

of the Term Policy.  CC ¶ 37 & n.1.  The UL Policy was also issued pursuant to a different

application, issued by a different entity, subject to the satisfaction of certain requirements, and

followed additional negotiation and discussion—including what product to convert to and the

jurisdiction in which it would issue.  The UL Policy also has a different issue date, insured age,

and policy number.  And it could only be issued if Plaintiff could attest that the "solicitation" and

"negotiation" of the UL Policy took place exclusively outside of New York, that the UL Policy

was applied for, issued, and delivered outside New York,  CC ¶ 35, Ex. I at -940, and that "all

aspects of this sale from initial discussion to policy del[ivery]" took place in New Jersey, Ex. I at -940. Unlike in *Dunken*, Plaintiff could not have "compelled [the UL Policy] by a suit in equity for specific performance." 266 U.S. at 400.[7]

In short, to the extent *Dunken*'s contractual analysis has any import, it stands for the proposition that a converted-to policy is a "continuation" of an original policy only when the terms of the converted-to policy are known at the time the original policy issued and there are no conditions or requirements that must be met before the converted-to policy issues. That does not describe the conversion of the Term Policy to the UL Policy.[8]

---

[7]    The *Dunken* court's comparison of *Dodge* and *Liebing* is also instructive. Specifically, the court found that the more conditional language in *Dodge*—"cash loans *can* be obtained"— as compared to the more absolute language in *Liebing*—"the company *will* loan amounts" —reserved some discretion to the company. *Dunken*, 266 U.S. at 397-99 (emphases added). This discretion supported the conclusion that the agreement was an "independent, subsequent agreement." *Id*. So too here. The language of the Conversion Option is similarly conditional: the UL Policy owner can "request . . . to convert" the policy but "[t]he Life Insured *must meet the requirements*" for the new policy, and the Conversion Option notes "conditions" to be met. Ex. A at -192 (emphasis added).

[8]    Plaintiff's reliance on *Ameritas* is similarly misplaced. *Ameritas* relied on—but misread— *Dunken* to hold that *any* policy converted to pursuant to a conversion right is a continuation of the original policy if it "exists only because of the conversion privilege." 2024 WL 4402028, at *5. But, as set forth above, that is not what *Dunken* held and is contrary to *Gans* and every case concluding that a life insurance policy issued pursuant to a conversion right in a group policy certificate is a "new" independent policy. In any event, *Ameritas* is on appeal to the Ninth Circuit. *Ameritas Life Ins. Corp. v. Wilmington Tr., N.A.*, No. 24-6801 (9th Cir. filed Nov. 8, 2024).

The other cases on which Plaintiff relies are also factually and legally inapplicable for reasons similar to why *Dunken* is inapplicable. *See Burr v. Equitable Life Ins. Co. of Iowa*, 84 F.2d 781, 781 (9th Cir. 1936) (converted-to policy attached to application for pre-conversion policy); *Goldwater v. Jackson Nat'l Life Ins. Co.*, 555 F. Supp. 1022, 1023-24 (N.D. Cal. 1983) (converted-to policy "was based upon and incorporated" pre-conversion policy application); *Phila. Life Ins. Co. v. Erwin*, 182 S.E. 209, 211 (Va. 1935) (pre- and post-conversion policies were "based upon the same application . . . and [bore] the same number"); *Silliman v. Int'l Life Ins. Co.*, 174 S.W. 1131, 1132 (Tenn. 1915) (no new application filed in connection with conversion); *Baker v. Washington Nat'l Ins. Co.*, 823 F.2d 156, 158 (5th Cir. 1987) (conversion was to pre-envisioned policy and conversion option indicated "some definite level of coverage"); *Occidental Life v. Hurley*, 513 S.W.2d 897, 901 (Tex. Civ. App. 1974) ("rights, obligations and liabilities" of converted policy were "fixed" by first policy); *Commonwealth Life v. Jackson*, 432 N.E.2d 1382,

4.    Plaintiff's Regulatory "Authority" Is Irrelevant

Plaintiff's reliance on a 2011 opinion letter from the New York Department of Insurance ("DOI Letter") addressing a fundamentally different scenario is unavailing.  Mot. 14.  The DOI Letter completely ignored *Gans*—binding precedent from the highest court in New York. Moreover, the DOI Letter was based on materially different facts.  The UL Policy here was issued by a different issuer than issued the Term Policy, which new issuer is not authorized to do business in New York, and the conversion request was made by a third party with no insurable interest in the insured.  None of these facts were at issue or addressed in the DOI Letter.  Moreover, the DOI was explicit that its general counsel opinion letters "are not orders, regulations, or decisions" but "merely explain[] the Department's policies, and the ways in which the Department interprets and enforces the Insurance Law."  Gen. Couns. Op. 6-13-2007 (#1), 2007 WL 1975579, at *2 (June 13, 2007).  It is neither binding nor persuasive here.

**C.    Due Process Requires That New Jersey Law Apply**

Finally, application of New York law to the UL Policy would be fundamentally unfair and violate due process.

It is well-settled that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981) (plurality opinion).  One party's domicile in a particular state is not alone enough to warrant the application of that state's laws. *Contant v. Bank of Am. Corp.*, 2018 WL 1353290, at *8 (S.D.N.Y. Mar. 15, 2018) ("Plaintiffs'

---

1388 (Ind. Ct. App. 1982) (conversion provision set forth explicitly what terms of new agreement would be).

domicile alone creates an insufficient state interest to justify applying a particular state's law under the Due Process Clause."). Therefore, a state's law cannot apply to an insurance policy consistent with the U.S. Constitution where the state's only connection to the policy is the domicile of one of the contracting parties. *See Dunken*, 266 U.S. at 399.

To the extent *Dunken* bears on choice of law at all, its Due Process and Full Faith and Credit holdings are instructive and compel the application of New Jersey law. There, having concluded, on the facts before it, that a converted-to policy was a "continuation" of a prior term policy entered into in Tennessee by a Tennessee-based insured and a Connecticut-based insurance company and delivered to Tennessee, the Supreme Court considered whether a Texas statute could control that policy given the insured had moved to Texas at the time the converted-to policy was delivered. The court concluded that Texas law could not apply consistent with the Due Process and Full Faith and Credit Clauses of the U.S. Constitution: the "Texas statute was incapable of being constitutionally applied to [the continued policy] since the effect of such application would be to regulate business outside the state of Texas and control contracts made by citizens of other states in disregard of [other states'] laws." *Id.*

Here, applying New York's law to the validity of the UL Policy would result in the same unconstitutional "regulat[ion of] business outside the state . . . in disregard of [New Jersey's] laws." *Id.* The UL Policy was "solicit[ed]" and "negotiat[ed]" in New Jersey between a Michigan-based company authorized to issue life insurance in New Jersey (but not New York), and the UL Policy was applied for, issued, and delivered in New Jersey and "all aspects of [its] sale from initial discussion to policy del[ivery]" took place in New Jersey. Ex. I at -940. The insured, Mr. Weinstock, lived in New Jersey and Plaintiff's manager signed the application for the UL Policy in New Jersey. CC ¶ 34. The only connection to New York is that Plaintiff is incorporated

there.  That contact alone cannot, consistent with due process, justify the application of New York law to the validity of the UL Policy.

## III.    JHUSA Is Not "Rewriting" The Terms Of Any Policy

Central to Plaintiff's Motion is the assertion that JHUSA's counterclaim re-writes the Term Policy.  JHUSA is doing no such thing.  It is blackletter law that no one, including JHUSA or JHNY, can contract around legislative requirements regarding insurable interest and strong public policy prohibitions against human life wagering.  *See, e.g.*, 4-23 Appleman on Ins. L. & Prac. Archive § 23.1 (2d 2011) ("If, of course . . . a policy provision contravenes the law, such contract or contractual provision is void.").

### A.    JHUSA Did Not Require Evidence of "Insurability"

Plaintiff argues that enforcing New Jersey's insurable interest requirement "rewrites" the Term Policy provision that JHNY "will not require evidence of insurability at the time of conversion."  Mot. 7, 10-12.  It does not.

*First*, "insurability" and "insurable interest" are distinct concepts.  "Insurability" is a term of art in the life insurance industry referring to an evaluation of the risk associated with insuring a particular individual's life.  *See Kallman v. Equitable Life Assur. Soc. of U.S.*, 248 A.D. 146, 148-49 (N.Y. App. Div. 1936), *aff'd*, 272 N.Y. 648 (1936).  It refers to the underwriting by which an insurance company assesses the proposed *insured's* physical and mental health and overall risk profile.  *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Thacher*, 15 A.D.2d 242, 248 (N.Y. App. Div. 1961) ("Evidence of insurability embraces more than merely good health or good physical condition; it may involve the mental attitude, possible suicidal tendencies, financial circumstances . . . and other factors."); 2 Couch on Ins. § 33:68 (3d 2025) ("[I]nsurability is used to embrace the concept of acceptability as a risk, without being limited to the insured's condition of health.  That is to say,

'insurability' means that the insured is a proper subject for insurance."). Plaintiff acknowledges as much in conceding that the Conversion Option gives a policyowner the right to apply for a permanent policy issued with the same risk classification "even if the insured is sick at the time of conversion." Mot. 5-6.

"Insurable interest," by contrast, is a statutory requirement that examines whether the *policyowner* or *beneficiary* possess an interest in the continued life of the insured. *See* N.J. Stat. § 17B:24-1.1(a) (defining insurable interest to include insured, close relative of insured, person with financial interest in continued life and health of insured, or corporation with legitimate financial interest in continued life of insured). The "insurable interest" requirement ensures that the policy is not a wagering contract contrary to public policy. *See Sun Life*, 238 N.J. at 165. Unlike "insurability," the "insurable interest" inquiry is not an assessment of risks that an insurer can choose to accept. Whether JHUSA agrees to insure a life, that policy is void *ab initio* without insurable interest. *Id*.

Accordingly, when JHNY agrees to waive "evidence of insurability," it necessarily means JHNY will not underwrite the health and overall risk of the person being *insured*; it has nothing to do with the separate statutory requirement—around which no party can contract—that the *policyowner* or *beneficiary* have a legally recognized insurable interest in the life of the insured.[9]

*Second*, even assuming that the term "insurability" encompasses the concept of "insurable interest," it is hornbook law that parties cannot negotiate around statutory requirements like

---

[9]    Regulations in New York expressly draw the distinction between "insurability" and "insurable interest." Specifically, New York requires that "guaranteed insurability option[s]"— *i.e.*, an option that allows the policyowner to purchase additional insurance coverage without requiring additional underwriting—state that such "guaranteed *insurability* option[s]" may only be exercised by a person "who has an *insurable interest* in the life to be insured." *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 380.6(d) (emphasis added). There would be no need for this requirement if "insurability" encompassed "insurable interest."

"insurable interest." Contracts are enforceable only to the extent that they are consistent with legal requirements and do not violate public policy. *See, e.g.*, *Boyle v. Huff*, 257 N.J. 468, 483 (2024) (freedom to contract "limited in those circumstances where a contract would otherwise violate public policy"); *Vasquez v. Glassboro Serv. Ass'n, Inc.*, 83 N.J. 86, 98 (1980) ("[C]ourts in New Jersey have refused to enforce contracts that violate the public policy of the State. No contract can be sustained if it is inconsistent with the public interest or detrimental to the common good." (internal citation omitted)); *Rocker v. Cardinal Bldg. & Loan Ass'n of Newark*, 179 A. 667, 677 (N.J. 1935) ("As the statute concerning withdrawals evidences the public policy of the state, any contract contravening such public policy is void, for the parties cannot waive or contract away the provisions thereof or rights or privileges acquired thereunder."). Thus, whatever the Term Policy said about "evidence of insurability," neither that provision nor JHUSA can override New Jersey's insurable interest law.

*Finally*, neither JHNY nor JHUSA ever asked for any evidence of insurability for the UL Policy. No evidence of Mr. Weinstock's health or other risk factors was requested or submitted in the Conversion Application before the UL Policy issued. *See* Ex. E at -183-87.

**B.      JHUSA Is Not Depriving Plaintiff Of Any Other Rights To Which It Is Entitled**

1.      The Conversion Option Is Not Absolute

Plaintiff's assertion that the Conversion Option was "an unconditional conversion right that is exercisable by any owner of the policy" and that enforcing New Jersey's insurable interest requirement would effectively bar "secondary owners" from exercising the Conversion Option misunderstands both the nature of the Conversion Option and fundamental contract law. Mot. 11-12.

As noted above, legal requirements supplant individual contract rights, and contractual provisions are enforceable only insofar as they comply with applicable legal requirements and do not violate public policy. *See supra* at 23-24. Accordingly, the Term Policy did not—and could not—give policyholders an absolute right to convert to a policy issued by every one of JHNY's affiliates. A term policyholder cannot, for example, exercise a conversion right to convert to a permanent life insurance policy issued by Manulife Japan (a JHNY "affiliate"). Manulife Japan, which has no presence in the U.S., is not legally permitted to issue life insurance policies to policyholders in the U.S. *See, e.g.*, N.Y. Ins. Law § 325 (requiring "alien" insurer to have office in New York). That is all that has occurred here: a secondary owner of the Term Policy cannot exercise the Conversion Option in a manner that contravenes state law.

Moreover, contrary to Plaintiff's assertion, "secondary owners" of the Term Policy are not categorically precluded from exercising the Conversion Option. If Mr. Weinstock had sold or otherwise assigned the Term Policy to someone with an insurable interest in his life (*e.g.*, a close relative or other person or business with a legitimate interest in his continued life), that secondary owner could have exercised the Conversion Option and procured a permanent policy insuring Mr. Weinstock's life. The outcome here would also be different had Plaintiff applied for a policy issued in New York rather than New Jersey given the material differences between the states' insurable interest and contestability laws. *See supra* at 10. But Plaintiff purposefully elected to apply for a policy issued in New Jersey by JHUSA (as opposed to a policy issued in New York by JHNY) because "pricing in NJ is slightly more advantageous than it is in NY." Ex. G at -690; Ex. I at -940. Having deliberately sought to take advantage of a policy issued in New Jersey, Plaintiff cannot now object to being subject to the requirements for insurance issued in New Jersey.

25

2.    <u>The Incontestability Provision Is Subject to New Jersey Law</u>

Notwithstanding Plaintiff's argument to the contrary, that the UL Policy is void *ab initio* under New Jersey law does not "rewrite" the incontestability provision in the UL Policy or the provision in the Conversion Application agreeing that the incontestability provision has been satisfied. *See, e.g.*, Mot. 3. As discussed above, insurance policies without insurable interest—including provisions regarding incontestability—are void *ab initio* under New Jersey law. JHUSA cannot contract around that well-established New Jersey public policy. *See supra* at 23-24.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Plaintiff's Motion.

Date: September 29, 2025

/s/ Robert Kingsley Smith
Timothy Perla (#4275178)
Robert Kingsley Smith (*pro hac vice*)
Yavor L. Nechev (*pro hac vice*)
Robert Donoghue (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109 USA
Tel.: (617) 526-6000
Fax: (617) 526-5000
Timothy.Perla@wilmerhale.com
Robert.Smith@wilmerhale.com
Yavor.Nechev@wilmerhale.com
Robert.Donoghue@wilmerhale.com

*Attorneys for Defendant John Hancock Life
Insurance Company (U.S.A.)*

## **CERTIFICATION OF WORD-COUNT COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the 8,750 word limit set forth in Individual Rule 2B and Local Civil Rule 7.1.  The word count, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 8,741 according to the word-processing system used to prepare the document.

Dated: September 29, 2025                                    */s/ Robert Kingsley Smith*
                                                                       Robert Kingsley Smith

## CERTIFICATE OF SERVICE

I hereby certify this 29th day of September 2025 that I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification to the attorneys of record and is available for viewing and downloading.

*/s/ Robert Kingsley Smith*
Robert Kingsley Smith
